**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**UNITED STATES OF AMERICA**

**vs.**                                                    **Case No.3:08cr79-MCR**

**CLAUDIA CONSTANCE HIRMER,
MARK STEVEN HIRMER,
EUGENE JOSEPH CASTERNOVIA,
ROBERT LEIGHTON PENDELL,
ARNOLD RAY MANANSALA,
DOVER EUGENE PERRY,
MICHAEL GUY LEONARD,
MARK DANIEL LEITNER,
        and
ARTHUR RAMIREZ MERINO,**
_____

## UNITED STATES' BRIEF IN OPPOSITION TO DEFENDANTS' ORAL RULE 29 MOTIONS

The United States, through undersigned counsel, submits this brief in opposition to the

oral Fed. R. Crim. P. 29 motions of defendants Claudia and Mark Hirmer,[1] Arthur Merino,

Eugene Casternovia, and Robert Pendell concerning the first object of count one, which alleges a

dual-object conspiracy to defraud the United States and to commit wire fraud.  As set forth

below, the defendants' motions should be denied.

### I. Legal Standards on a Rule 29 Motion

The question before the court at the Rule 29 stage is whether the evidence adduced in the

government's case in chief – construed in the light most favorable to the government, drawing

---

[1] This filing addresses only the defendants' oral Rule 29 motion, on which the Court solicited further briefing from the United States, not the recently-filed written Rule 29 motion of the Hirmers.  See Docket No. 1101.  Further briefing on that motion will be forthcoming.

all reasonable inferences in its favor, and resolving all credibility disputes in its favor – is

sufficient to permit a reasonable jury to find each element of the offense beyond a reasonable

doubt.  See, e.g., United States v. Merrill, 513 F.3d 1293, 1299 (11th Cir. 2008).  The evidence

need not be "wholly inconsistent with every conclusion except that of guilt."  Id.  Rather, a Rule

29 motion must be denied unless a jury could not find the defendant guilty on "any reasonable

construction of the evidence."  Id.

## II. The Charge and the Elements of the Offense

The first count of the indictment charges a dual-object conspiracy in violation of 18

U.S.C. § 371.  The first object of the conspiracy, at issue here, alleges that the defendants

conspired to defraud the United States "by dishonest means, by attempting to impede, impair

obstruct, and defeat the lawful government functions of the Internal Revenue Service in the

ascertainment, computation, assessment, and collection of income tax ... ."  This is type of

conspiracy to defraud the United States is commonly referred to as a Klein conspiracy, so named

after United States v. Klein, 247 F.2d 908 (2nd Cir. 1957).

Hence, the elements of the offense are (i) the existence of an agreement with an unlawful

objective, in this case to defraud the United States by impeding, impairing, and obstructing the

IRS, (ii) the defendant's knowing and voluntary participation in the agreement, and (iii) an overt

act in furtherance of the conspiracy.  United States v. Adkinson, 158 F.3d 1147, 1153 (11th Cir.

1998).  Some cases also state that the obstruction of a lawful government function contemplated

by the conspiracy must be by "deceit, craft, trickery, or at least means that are dishonest."

Caldwell, 989 F.2d at 1059 (citing Hammerschmidt v. United States, 265 U.S. 182, 188 (1924)).

Caldwell states the elements of the offense as follows: "The government need only show (i) [the

defendant] entered into an agreement, (ii) to obstruct a lawful function of government, (iii) by deceitful or dishonest means, and (iv) at least one overt act in furtherance of the conspiracy." Id.

Unlike prosecutions under the "offense clause" of 18 U.S.C. § 371, the object of an agreement prosecuted under the "defraud clause" of § 371 need not be independently criminal. "The 'defraud' part of § 371 criminalizes any willful impairment of a legitimate function of government, whether or not the improper acts or objectives are criminal under another statute." United States v. Tuohey, 867 F.2d 534, 537 (9th Cir. 1989). The "defraud" clause of § 371 is substantially broader than common law fraud, and broader even than the concept of fraud embodied in the mail and wire fraud statutes. McNally v. United States, 483 U.S. 350, 358 n.8 (1987), abrogated on other grounds by statute, 18 U.S.C. § 1346. In a defraud clause prosecution, "neither the conspiracy's goal nor the means used to achieve it need to be independently illegal." Caldwell, 989 F.2d at 1059. While "the failure to disclose income is, without more, generally insufficient to establish a Klein conspiracy," it is equally true that the "failure to properly report income can constitute the requisite act in furtherance of a Klein conspiracy." Adkinson, 158 F.3d at 1154. In short, the government must show "an agreement among the conspirators with the intent to obstruct the government's knowledge and collection of revenue due." Id. at 1154 (internal quotation omitted).

In other words, there must be sufficient facts from which the jury could conclude that the object or goal of the conspiracy was to impede, impair, or obstruct the IRS. Hence, "if impeding the IRS is only a collateral effect of an agreement, rather than one of its purposes, then a conviction for a Klein conspiracy cannot stand." Id. at 1155. "On the other hand, a conspiracy may have multiple objectives, and if one of its objectives, even a minor one, be the evasion of

federal taxes, the offense is made out." Id.  "An agreement to conceal income and assets from

the IRS constitutes a conspiracy to defraud the United States whether or not the entities used are

shams."  United States v. Schmidt, 935 F.2d 1440, 1447 (4th Cir. 1991), abrogation on other

grounds recognized by United States v. Delfino, 510 F.3d 468 (4th Cir. 2007).

Moreover, there is no authority that the government must show a pecuniary loss to the

United States, or that it was deprived of money or property at all.  In that respect, there is no

requirement that the government prove a tax due and owing.  Rather, it is enough that the

agreement had the purpose of impeding or obstructing a lawful government function through

dishonest means.  The statute reaches "any conspiracy *for the purpose* of impairing, obstructing,

or defeating the lawful function of any department of government."  Dennis v. United States, 384

U.S. 855, 861 (1966) (quoting Haas v. Hinkel, 216 U.S. 462, 479 (1910)) (emphasis added).

Thus, properly framed, the question before the Court is whether a reasonable jury could

conclude that the Hirmers, Merino, Casternovia, and Pendell were part of an agreement, and that

one purpose or goal of that agreement was to use dishonest means to impede, impair, and

obstruct the IRS in performing its duties.

### III. Defendants' Joint Efforts to Promote PQI's Tax Products Manifest an Agreement.

The five defendants raising Rule 29 motions about the Klein object of count one all

actively marketed PQI tax products – Bill Benson's "reliance defense" package, SORCE, IMF

Decoder, corporations sole, or a combination thereof.  Taking the evidence in the light most

favorable to the government, their common marketing efforts under the PQI umbrella manifest a

common agreement.  Simply put, the evidence of the Klein object of count one is the sales,

promotion, and marketing of PQI and its vendors.  A common agreement is shown from the

operation in fact of PQI as a business enterprise and from the nexus of explicit agreements

concerning different aspects of PQI's operation.  From this nexus of explicit agreements and

from the evidence about how PQI was marketed on the ground, a reasonable jury could infer that

there was an implicit agreement among the defendants and others to accomplish an overarching,

unlawful purpose: the promotion and sale of fraudulent tax evasion products, and of PQI

memberships as a gateway to those products.  The agreement's unlawful goal and purpose of

impeding and obstructing the IRS is shown from:

(i) the nature of the vendor products themselves (tax-related and inherently deceitful);

(ii) the manner in which the tax products were marketed (as tools for hiding income and assets,

    removing oneself from the tax system, and creating a paper trail manifesting

    "misunderstanding" about the tax law in case of a criminal prosecution);

(iii) the organizational culture of PQI (in which non-filing and non-payment of taxes were touted

    as aspirations, and in which notorious tax defiers and felons were honored as heroes); and

(iv) the manner in which the vendor products were actually used by defendants (to hide untaxed

    business income).

    First, as to the "agreement" element: hundreds of "like-minded" participants and dozens

of "like-minded" vendors did not arrive at offshore conferences[2] by accident or mistake.  Rather,

as noted, there was a nexus of explicit agreements involved in the day to day operations of PQI:

---

[2] Of course, offshore conferences are not inherently unlawful.  Neither is offshore
banking, nor the use of LLCs, trusts, or corporations.  In fact, so far as the prosecutors are aware,
even warehouse banks are not always illegal per se.  But all of these tools may be used for an
unlawful purpose.  An unlawful intent may transform an otherwise-lawful act into a crime.  That
is the import of the overt act requirement of conspiracy law and the affirmative act requirement
for tax evasion.  The evidence of defendants' unlawful purpose in selling and operating PQI is
not only sufficient to permit a guilty verdict, it is overwhelming.

Qualified Consultant agreements between marketers and the Executive Council (EC), vendor agreements between vendors and the EC, EC agreements among EC members, and Q2/Q3 confidentiality agreements between offshore conference participants and the EC, just to name a few.  But these explicit agreements manifest a few common, overarching purposes: to make money for PQI marketers and their "uplines" by selling PQI memberships and vendor products, to help the marketers and clients conceal their money from the IRS, to ensure the longevity of PQI by minimizing the risk that law enforcement would discover its activities, and to create the appearance of good faith for PQI, its marketers, and its clients once the IRS caught on.[3]

A few discrete facts manifest such an overarching agreement.  One is the symbiotic relationship between PQI and its vendors.  PQI's vendors, not the organization as such, were the big draw for new clients.  Yet clients could not access the vendors without first buying the Q1, Q2, or Q3 product from PQI.  Most vendors had exclusivity arrangements with PQI – they accepted clients from no other source.  (SORCE was the exception, but they received the vast majority of their clients from PQI, and would not accept a prospect referred from a PQI affiliate unless the prospect first bought the Q1.)  In exchange for this exclusive-dealings relationship, the vendors gained access to a ready market of "like-minded" individuals.  SORCE and MYICIS, for example, exponentially increased their business once they affiliated with PQI.  Clients joined PQI to access the vendors, and vendors joined PQI to access the clients.

Likewise, the testimony of Joe McPhillips establishes that PQI's sales force – qualified

---

[3] These common purposes are evidence of a common agreement, because a common goal and overlapping participants are probative evidence of a conspiracy's existence.  See, e.g., United States v. Brown, 587 F.3d 1082, 1089 (11th Cir. 2009).  Further, "separate transactions are not necessarily separate conspiracies, so long as the conspirators act in concert to further a common goal."  Id.

consultants, or QCs – was deployed on behalf of the vendors, including the fraudulent tax evasion vendors.  QCs who were nominally unaffiliated with a particular PQI vendor often received "thank you" or referral bonuses if they steered clients to that vendor.  SORCE, for example, paid such referral bonsues.  And in any event, to promote PQI was to promote its vendors, because the vendors were the hook.  Far from being discrete and unrelated enterprises, PQI and its vendors were financially interdependent.  Indeed, any particular sale could profit a number of people: the salesman, his upline (if the salesman was not yet "qualified"), Mark and Claudia Hirmer (via SPI), and whatever vendor intrigued the client enough to sign up for PQI at all – frequently a tax vendor.  Often, a combination of these parties would be involved in a typical PQI sale.  The QC frequently made the initial pitch, then referred the prospect to a "three way call" with an EC member or upline who would extol the tax product's virtues in a testimonial.  Also, prospective clients were frequently directed to recorded calls promoting the pertinent tax vendor's product – whether SORCE, IMF Decoder, or another.  The three way call was recorded by a representative of the vendor, but PQI's EC maintained the calling system, and publicized the list of recorded calls by vendors on PQI's marketing website.  "Live calls" for products allowed PQI vendors to push their products to a larger audience.  As with the three way calls, the vendors did most of the talking, but PQI's EC maintained the infrastructure, and PQI's sales force did the promotional legwork.  Moreover, in other live and recorded calls, EC members promoted the offshore conferences by talking up the vendors who would be present, including the tax evasion vendors.  Thus, PQI and its vendors marketed each other.

In short, a combination of parties stood to profit from the client's eventual purchase of the Q1 and the vendor product, so a combination of parties joined forces to help make the sale.

This confluence of interests, and the joint efforts towards this common purpose, suggest a common agreement.[4]  Like any retail business, PQI's constituent parts – its suppliers (vendors), sales force, and management – worked together to sell products to clients.  Those joint efforts manifest a common plan or agreement.  But unlike a typical business, PQI's tax products were fraudulent and illegal, as set forth in the next section.

## IV. PQI Vendors' Tax Products Were Intended to Conceal Assets from the IRS – Manifesting the Unlawful Purpose of the Agreement.

The government has proven that the products sold by PQI vendors (and promoted by PQI's sales force to attract new members) were specifically intended to impair and impede the lawful functions of the IRS in ascertaining, computing, assessing, and collecting income taxes.  Specifically, PQI vendors sold products designed to conceal income and assets from the IRS.

Foremost in this regard was SORCE, represented by defendants Casternovia and Pendell.  According to the testimony of Mark Lyon, SORCE was a continuation of an enterprise begun by John David Van Hove (also known as Johnny Liberty), a vendor in the Institute for Global Prosperity, PQI's predecessor organization.  Mr. Van Hove was convicted of wire fraud and a Klein conspiracy.  Defendants Casternovia and Lyon were personally acquainted with Mr. Van Hove – indeed, sold his products – and followed his criminal case.  Just like various products sold under the Global umbrella, including the Poseley trusts that landed David Struckman in jail, SORCE's products were specifically intended to create the false appearance that a client did not own or control assets which he in fact owned and controlled.  This tax evasion strategy was

---

[4] See, e.g., United States v. Kopituk, 690 F.2d 1289, 1323 (11th Cir. 1982) (conspiracy may be proved circumstantially, and defendant's participation may be inferred from commission of acts which further the conspiracy's object).

concisely summarized as "own nothing, control everything."  The purpose for implementing the this strategy was to become "lien proof, levy proof, judgment proof, and IRS proof."  The concepts of "own nothing, control everything" and "lien, levy, and judgment proof" (and hence, IRS proof) were integral parts of how SORCE was marketed by PQI QCs.

So, too, Arthur Merino's corporation sole was designed to allow a client to "own nothing, control everything."  A corporation sole is a type of religious entity recognized under the laws of Washington state, but is intended for "bishops, overseers, or presiding elders" of a church.  See Rev. Code. Wash. § 24.12.010 et seq.  The "corporation soles" marketed by Merino were designed to give the appearance that all the client's assets were owned by a non-profit religious entity, when in fact the client would retain ownership and control of the assets.  Merino advertised the corporation sole as an asset protection device.  But the testimony elicited at trial indicated that, in the context of PQI marketing, asset protection was thinly-veiled reference to protecting assets from the IRS.

SORCE and Merino were not the only PQI vendors selling products intended to conceal assets from the IRS.  The MYICIS "warehouse bank" had a similar purpose, but used different methods.  MYICIS was a pooled bank account.  It maintained an account at one legitimate bank, into which all MYICIS customers' funds were deposited.  Wayne Hicks maintained control of the MYICIS account and kept internal records which tracked the records of each customer's sub-account within the pooled account.  MYICIS customers could send and receive custom-made money orders which would clear out of the pooled account.  Customers could also make member-to-member transfers of funds.  Because such transfers took place entirely within the MYICIS pooled account, they were invisible to the outside world, and required only a change in

Hicks' records.  As such, MYICIS was an effective way of concealing the disposition of assets

from the IRS.  Wayne Hicks testified that MYICIS was marketed to PQI's "patriot movement"

base, by himself and others, as a method for hiding assets from the IRS, and that MYICIS's

concealment features were a prime selling point of its services.  MYICIS was brought into PQI

on the recommendation of SORCE (particularly Mr. Casternovia), and SORCE's paperwork

recommended that its clients use MYICIS.

   The evidence at trial also established that PQI vendor IMF Decoder fit perfectly into the

organization's overarching purpose of impeding and impairing the IRS.  IMF Decoder sold its

clients a letter writing campaign – a series of correspondence, supplied by IMF Decoder, to be

sent to the IRS on behalf of the client.  This correspondence requested the client's Individual

Master File from the IRS, then purported to "decode" it – inevitably and invariably

"discovering" that the taxpayer was incorrectly classified by the IRS as engaged in an excise-

taxable activity.  One IMF Decoder fixed the "mistake," the client was no longer liable for

income taxes.  Moreover, clients like Andrew Cordova were instructed to stop filing, lest they

"volunteer" themselves back into the income tax system.  More important than the rationale,

however, was the paper trail.  As marketed, IMF Decoder was held out as a way to create a

"record" in the IRS's "own files" of the client's position with respect to his tax liability and

filing requirements.  Accordingly, the jury could reasonably conclude that IMF Decoder's true

purpose was to create a paper trail of ostensible good faith misunderstanding of the law, to which

the client could point in the event of a criminal prosecution.  Such a product was necessary

because IMF Decoder, like other PQI contributors, encouraged clients to stop filing and paying

taxes.  It was widely understood and discussed that such activity could result in criminal

liability.[5]

In short, "asset protection" products sold under the PQI umbrella were intended to give the false appearance that the client did not own or control assets. The SORCE structures were marketed as a way to give the false appearance that the assets were held by a business entity, controlled by persons exercising independent business judgment. The corporations sole were marketed as a way to maintain control of assets while giving the false appearance that the assets were held by a religious organization and used for a religious purpose. In fact, both types of packages were designed to allow the client to retain complete control over the assets nominally held in corporate form. Similarly, MYICIS was intended to hide money from the IRS. IMF Decoder, for its part, sold the client a paper trail of good faith and an excuse for non-filing. Given these purposes, the SORCE, MYICIS, and corporation sole products were intended to obstruct the IRS in determining the taxes of PQI clients by hiding assets. Indeed, this common goal of tax obstruction was one of the main purposes for PQI's existence. PQI promotional materials touted its vendors as providing drastic "tax reduction" or even "tax elimination," and such vendors were, along with debt elimination, a principal selling point for the organization. Given the purpose of these products, a reasonable jury could find that they were intended to impede and impair the IRS in computing and collecting the income taxes of clients who purchased them.

A reasonable jury could also find the "deceitful and dishonest means" requirement of

---

[5] That IMF Decoder was intended to provide a "good faith" defense to prosecution was confirmed by (i) the testimony of Joe McPhillips' and Tami Figueroa Tunsen, and (ii) Claudia Hirmer's three way call in which she encouraged clients to purchase both Bill Benson's reliance defense package and IMF Decoder for double protection. Benson's "reliance defense" package, on its face and by its very title, purported to provide a defense to criminal charges.

Caldwell and Hammerschmidt to be satisfied, because's PQI tax products were inherently dishonest and deceitful. The entire mantra of "own nothing, control everything" embodies this point. The structuring and asset protection products were designed to give a false appearance: that assets owned and controlled by the client were actually owned by an offshore corporation or religious institution. This deception had a tax-related motive: becoming "lien, levy and judgment proof" so that the IRS could not take the client's possessions once he stopped paying taxes. In that respect, the products were designed to obstruct the IRS by dishonest means.

MYICIS was also inherently deceitful and dishonest. The entire point of a warehouse bank was to give impression to the IRS and the bank (known to be willing to cooperate with the IRS) that all the money in the pooled account was beneficially owned by the warehouse banker, Wayne Hicks. Yet in fact, the MYICIS client retained control and beneficial ownership of the funds. Caldwell is not to the contrary. It merely holds that a conspiracy conviction of a warehouse bank employee could not stand because the jury was not instructed to consider whether the defendant employed deceitful and dishonest means to impede the IRS. Id. at 1060-61. Caldwell does not hold or even suggest that a warehouse bank is anything other than deceitful or dishonest – it merely reversed because the jury was not duly instructed.

Bill Benson's reliance defense package and IMF Decoder are equally deceitful. To the degree each was intended to provide a "reliance defense" to forecasted criminal proceedings, they show precisely the opposite of good faith. Good faith beliefs cannot be bought and sold. But a paper trail manifesting "confusion" about the law (really, disagreement with it) can. These two products were intended to give the false appearance of good faith in the event of a criminal prosecution. Again, such a product was necessary because PQI and its vendors, as an

organization, encouraged the non-filing and non-payment of taxes, and it was widely understood that this could result in civil and criminal liability.

In short, the evidence shows a common agreement among PQI's vendors, QCs, and ECs to promote and sell products, and that those products were specifically intended to obstruct the IRS in determining clients' tax liabilities. Those products that did not hide assets were specifically intended to create the false appearance of a misunderstanding of the law, for the purpose of insulating the client from criminal liability. A reasonable jury could conclude that these were the goals of PQI's products, and hence, could conclude that the purpose in marketing them was to impede and impair the IRS. The analysis next turns to the evidence of each defendant's participation in this agreement.

## V. The Defendants Joined the Unlawful Agreement

The defendants' respective roles within PQI, and their marketing efforts, manifest that they joined the conspiratorial agreement. In this regard, "it is irrelevant that particular conspirators may not have known other conspirators or participated in every stage of the conspiracy." Brown, 587 F.3d at 1090. Rather, the "dispositive consideration" is not whether any two defendants "dealt with each other, but whether each of them participated in the overall conspiracy." Id.

First, consider Claudia Hirmer. The evidence of her participation in the conspiracy is voluminous. PQI typically did not allow a vendor to join without prior approval by the EC, of which defendant Claudia Hirmer was the informal head. She confirmed SORCE's entry into PQI in an email to defendant Casternovia. Claudia Hirmer was in charge of the EC's ostensible "investigation" process of persons who sought to become PQI vendors. The vetting process

typically included a criminal background check.  But the vetting process did not result in the

exclusion of Bill Benson, convicted of felony tax evasion; in fact, he was lauded as a hero for his

open defiance of the tax laws.  Nor did the vetting process result in the exclusion of Wayne

Hicks or MYICIS, despite previous criminal convictions for offenses involving dishonesty.  The

jury could reasonably infer that this was because (i) MYICIS was presented to the EC with co-

conspirator Casternovia's seal of approval, and (ii) MYICIS offered a service PQI clients

desperately wanted: domestic banking without the provision of a social security number.  The

thirst for vendors like Benson and MYICIS confirms that anti-tax ideology, and the desire to

implement that ideology by hiding assets from the IRS, were significant driving forces behind

PQI's existence.  Claudia Hirmer shared that ideology and that desire.  She pushed Benson's

reliance defense package on recorded calls and bought the package herself.  She used MYICIS

and led the EC when it made the decision to admit MYICIS into PQI.  That the EC vetting

process was willing to overlook Benson's and Hicks' prior criminality manifests PQI's

commitment to tax evasion at the organizational level.  That organizational commitment was

largely a result of Claudia Hirmer's leadership.

Next, consider PQI's promotional materials.  The promotional materials for PQI held out

its vendors – including the tax vendors – as "world class contributors" who had passed a rigorous

screening process.  The promotional materials also claimed that PQI's contributors possessed

secret, insider knowledge about the true operation of government, including the tax system.

Further, such knowledge had been deliberately suppressed from public schools and the graduate

education of legal, tax, and accounting professionals.  Accordingly, while PQI contracts were

rife with disclaimers about doing one's own due diligence, the none-too-subtle message –

explicitly stated from time to time – was that PQI had verified the content of its promoters' messages, and that consulting an independent tax or legal professional would be counterproductive because PQI's tax vendors were more knowledgeable.  These promotional materials were devised, maintained, and sanctioned by the Executive Council, headed by Claudia Hirmer.  As such, she was ultimately responsible for their content.  They were posted on PQI's websites – controlled by Ms. Hirmer through her son-in-law, who acted at her direction – and thereby distributed to PQI marketers and clients.  PQI, through its consultants and EC members, held its tax-related speakers and vendors out as knowledgeable experts.  But in fact they were frauds and criminals.

In addition to causing PQI to sanction these vendors and promotional materials, Claudia Hirmer did sales and marketing of her own.  She openly pushed Bill Benson's package and IMF Decoder on a recorded call with Nadine Griffin, and in emails to clients and marketers.  The email evidence reflects that Mark Hirmer, too, steered clients to IMF Decoder and SORCE, holding these vendors out as selling points in attempting to make his own Q1 and Q2 sales.

Casternovia and Pendell also joined the agreement to promote fraudulent tax vendors.  As the CEO of SORCE, Casternovia sold his own structuring product in client meetings at his Ashland, Oregon office, and elsewhere in the United States.  Pendell, as a SORCE salesman, did likewise.  Based on the testimony of Mark Lyon and Sue Ripkin, and the undercover evidence, a reasonable jury could conclude that Casternovia and Pendell knew the mechanics and purpose of SORCE's structuring product, and intended for clients to implement it in a way that concealed their income from the IRS.  Casternovia devised the product and was the last word on product-related and operational decisions at SORCE.  He extensively marketed SORCE's product, for

example, using the analogy of a "puppet show" on the Q1 CD set to describe the appearance

SORCE's entities were intended to create.

Pendell was also involved. Pendell directed Sue Ripkin to set up nominee LLCs, the first

layer in SORCE's multi-entity structuring product. The jury could infer that Pendell knew, from

his conversations with Lyon, Casternovia, and Ripkin, that Ripkin would resign from her

position with the LLC immediately upon its formation, and knew the client would ultimately

direct and control the LLC. As evidence of Pendell's criminal purpose, consider his meeting

with an undercover IRS agent posing as a tile importer. Pendell encouraged the client to use

SORCE's products to create an offshore corporation, which the client would control. The client

would "pay himself a salary" of whatever amount he wished, and report that amount to the IRS,

claiming to be a mere employee of the offshore corporation. Meanwhile, the client would retain

actual ownership and control of the company, and would control the untaxed funds it sent

offshore, disposing of those funds however he saw fit without taxation. The deceptive

arrangement described by Pendell is consistent with Lyon's description of how SORCE's

structures operated in practice.

Casternovia and Pendell also traveled to Q2 offshore seminars together, where they tried

to drum up business at SORCE's booth. Typically, Casternovia was also a featured speaker on

the Q2 main stage. Casternovia and Pendell also made Q1 and Q2 sales themselves. Moreover,

SORCE would not do business with a potential client referred from a PQI source unless the

prospect bought the Q1 CD set first. Both men also had personal MYICIS accounts. More

importantly, both had access to SORCE's MYICIS account. Pendell in particular received sales

commissions that were paid through SORCE"s MYICIS account, and he used that account to

transmit the wholesale proceeds of his PQI to SPI.  These financial arrangements demonstrate their purpose to conceal SORCE's activities and their personal income from the IRS.

The recorded statements of Casternovia and Pendell also manifest their intent to impede and impair the IRS.  When asked by an interviewer what were the benefits or consequences of everything he had "learned" at SORCE, Pendell's first response was "well, my tax liability is zero!"  Then he laughed.  Pendell's reaction indicates that underneath all the "sovereignty" and "privacy" talk, SORCE's mission was to help clients get away with not paying taxes.  That mission made SORCE a perfect fit for PQI.  SORCE helped PQI gain clients, and in turn PQI helped SORCE gain clients.  PQI and SORCE joined forces to advance a common purpose: selling tax evasion products.

Defendant Merino also joined the agreement to defraud the United States.  The tax purpose of his corporation sole product is manifest from the way it was marketed.  Despite the strict limitations on the corporation sole imposed by the above-cited Washington statute, Merino sold the entities as an asset protection device for anyone, whether clergy or not.  As set forth below, Merino also organized his business as a corporation sole despite its demonstrably for-profit nature.  Merino's use of the product informs the intent with which it was sold.  Merino was also an Executive Council member for several months after PQI's inception, and thus helped shepherd the transition from Global to PQI.  Given Merino's involvement with PQI, and the nature of the tax product he sold under its umbrella, the jury could reasonable infer both membership in the conspiracy and a purpose to impede and impair the IRS.

## V. Defendants' Personal Use of the Tax Products Further Manifests Their Intent to Impair and Impede the IRS.

The tax products were also intended to frustrate the computation and collection of the

defendants' personal taxes.  In this respect, the means and methods section of count one alleges that "PQI owners, Executive Council members, Qualified Consultants and vendors often personally engaged in acts designed to impede, impair, obstruct and defeat the lawful government functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of their individual income tax. Such acts included frivolous correspondence, threats of legal retaliation, creation of false and fraudulent financial information, and extensive use of offshore entities and accounts."  This allegation was amply proven; these defendants became "products of the product."  Such personal use of the tax products is highly probative of the intent with which the products were marketed.  Becoming a "product of the product" was held out by David Struckman and other PQI leaders as a marketing tool, indeed, as a requisite to attaining true success as a marketer.  Since the Hirmers, Casternovia, and Merino – all visible figures within PQI – were using the tax products to hide their untaxed income from the IRS, as explained below, and since that use was consistent with how the products were marketed, it is all the more reasonable for the jury to infer that hiding assets was the entire point of the products.

Defendants Claudia Hirmer, Mark Hirmer, Eugene Casternovia and Arthur Merino implemented structuring products in organizing their businesses and personal finances.  Their use of the product is consistent with an intent to hide income and assets from the IRS.  SORCE was ostensibly a "division" of Castlenuevo, Inc., a Panamanian corporation set up by POSI, controlled by Mr. Casternovia, and owned by Forth in Freedom Foundation.  Forth in Freedom was a Panamanian foundation, also organized at Mr. Casternovia's direction and controlled by him.  Untaxed operating revenues from SORCE were moved offshore to Panama by Mr.

Casternovia through bank and brokerage accounts controlled by these entities.  Likewise, the Hirmers set up and controlled PQI, Synergy Productions International (SPI), and Hope International Foundation, all organized in Panama.  They used the accounts of those entities to move money offshore.  The Hirmers and Casternovia were also active MYICIS users, holding both personal accounts and accounts on behalf of their businesses.

Given the testimony of Mark Lyon, Sue Ripkin, and Rachel Willen, the jury could reasonably conclude that all these entities were shams and/or nominees.  The defendants' Panamanian entities were set up by the same document mill, Panama Offshore Services International (POSI), that SORCE used to establish sham entities for its clients.  Mark Lyon testified that POSI was SORCE's "partner in Panama" and that the SORCE/POSI client always retained control over the corporation's or foundation's affairs – that was the entire point of the exercise.  POSI employed same handful of nominee directors as the officers of the companies they incorporated on behalf of clients.  (SORCE's paperwork actually used the term "nominee" director.)  These nominee directors appeared on the public registry paperwork for the Hirmers' and Casternovia's corporations.  But they exercised no independent discretion.  The nominee directors were "officers" of dozens, if not hundreds, of Panamanian companies.  It would be impossible for them to exercise any discretion or control over the companies' affairs.  And Mark Lyon testified that these nominee directors in fact never exercised any independent control or discretion over any companies' affairs.  POSI and the nominee directors it employed at all times acted at the client's direction.  The client retained complete control over the disposition of the assets nominally held in corporate form.  That was the point.

Moreover, the jury heard evidence that the Panamanian accounts of PQI and SPI funded

numerous demonstrably personal expenditures of the Hirmers, including (i) a personal residence and improvements thereto, (ii) closing costs on the sham mortgage on their home the Hirmers granted to Hope International Foundation, and (iii) a deposit at the Emerald Grande, booked for the Hirmers' daughter's wedding reception.  These extensive (and expensive) payments confirm that the Hirmers' Panamanian companies were not true business entities, but personal piggybanks of the Hirmers.

Based on the operation in fact of the Panamanian entities, and the way they were marketed to PQI clients, the jury could quite reasonably infer that they were shams and/or nominees, and that Casternovia and the Hirmers maintained control over the assets therein at all times.  That was how they were marketed, and that was how they were used.  Such use confirms the criminal intent with which the entities were promoted and sold.

Similarly, Merino's organization of his business, Financial Solutions, as a corporation sole, confirms that he marketed those corporations sole with criminal intent.  Corporations sole are supposed to be non-profit, eccelsiastical entities that permit a church to retain control of its property in perpetuity.  <u>See United States v. Hovind</u>, 2009 WL 2369340 at *1 n.3 (N.D. Fla. July 29, 2009).  Financial Solutions made substantial profits – mostly selling debt elimination and PQI memberships, not corporations sole – but the organizational form of the business remained a corporation sole.  The organizational papers described the business as a ministry, but Merino (a lay minister) did whatever he wanted with the money.  Financial Solutions was not affiliated with any organized church.  Merino controlled it.  As such, Merino was accountable to no church for the money – indeed, to no one but himself.  Merino's use of the corporation sole was consistent with the way the product was marketed.  There was a token nod to the corporation

sole's religious purpose, but as marketed and implemented, the purpose was to create a layer of paperwork between the client and the assets he controlled.  Own nothing, control everything.

These corporations sole, like SORCE's products, were sold under the PQI umbrella. Moreover, like the other defendants, Merino did not file returns or pay taxes during PQI's heyday from 2002 to 2006.[6]  These facts amply demonstrate that Merino, like the others, joined an agreement to market fraudulent tax evasion products under the PQI umbrella.

## VI. The Evidence is Sufficient to Support a Guilty Verdict on the First Object of Count 1

Thus, the question is whether the promotion of these fraudulent and inherently deceitful schemes, as well as the defendants' personal use of them, is sufficient to permit a reasonable jury to return a guilty verdict on the Klein prong of count one.  The answer is yes.  Courts of appeals have affirmed Klein conspiracy convictions based on the promotion of fraudulent tax evasion schemes.  In this respect the caselaw does not require, as the Hirmers suggested in court, that the "deceit" or "dishonest means" required by Hammerschmidt and Caldwell must be directed at an IRS officer contemporaneous with an audit or collections activity.  Rather, cases reflect that promoters of fraudulent tax evasion schemes may be convicted of a Klein conspiracy based on their promotion and sales activities alone.  In other words, a Klein conspiracy need not be intended to frustrate the IRS in the ongoing assessment and collection of taxes from one of the co-conspirators.  It is enough that the conspirators intend to frustrate the proper computation and collection of *someone's* taxes – including the future tax liabilities of a fraudulent promoter's client.  It is the obstructive and deceitful nature of the tax product itself – whether giving the

---

[6] Unlike the other defendants, Merino e filed his back taxes beginning in August 2006 – after the criminal investigation of PQI became overt when search warrants were executed at the offices of PQI and SORCE, among others.

false appearance that the client's assets are owned by another, creating phony deductions devoid of economic substance, or the like – which manifests an intent to impede and impair tax administration by dishonest means.

A closely analogous case is <u>United States v. Scott</u>, 37 F.3d 1564 (10th Cir. 1994). In <u>Scott</u>, the defendants promoted a tax evasion scheme that relied on a series of domestic and offshore trusts to hide income and assets. Clients were instructed to transfer their business and personal assets to the trusts to avoid their tax liabilities and detection by the IRS. Although the promoters devised trusts which were appeared legitimate on paper, in practice the client retained "perpetual control" of the trust corpus, and became, "as a practical matter," the sole beneficiary of the trusts. <u>Id.</u> at 1571. Although the trusts were not inherently illegal, they were used for an illegal purpose. Hence, "the government attacked the selling scheme as fraudulent . . . not because of the form of the trusts but because of the way they were operated." <u>Id.</u>

The trusts in <u>Scott</u> – like the "structuring" products of SORCE and the corporations sole of Financial Solutions/Everest Consulting – were "marketed as a device for the purchasers to eliminate income tax liability without losing control of their money and other assets." <u>Id.</u> at 1570. In other words, "own nothing, control everything." As such, the trusts had an unlawful purpose. The Tenth Circuit stated that "the fraud in these transfer arrangements was apparent" because tax consequences of an arrangement "depend upon the substance of the transaction, not the form." <u>Id.</u> at 1572. Like the "asset protection" vendors of PQI, the <u>Scott</u> trusts were marketed for both tax and non-tax purposes – e.g. "hiding assets from creditors and avoiding probate." <u>Id.</u> "But an obvious purpose was to hide assets and income from the federal taxing authorities." <u>Id.</u>

In affirming the convictions of the salesmen of these trusts, the court of appeals cited numerous facts pertinent here.  Like PQI, the trust scheme in Scott required aspiring salesmen to bring in a certain number of purchasers before they could receive commissions themselves.  Id. at 1573.  Like PQI salesmen pitching SORCE, the trust salesmen in Scott told clients they could completely eliminate their taxes.  Id.  The salesmen in Scott also indicated that clients should avoid creating a paper trail for the IRS; that was precisely the purpose of SORCE's structuring package.  The Scott salesmen emphasized that the client retained complete control of the assets as part of the pitch for their scheme.  Id.  Scott is on point and militates strongly in favor of denying defendants' Rule 29 motion.

Similarly, in United States v. Bedford, 536 F.3d 1148 (10th Cir. 2008), the Tenth Circuit affirmed a Klein conspiracy conviction against the promoter of an "asset protection" service. This asset protection program, which promised tax deferral through the use of "bogus" domestic and offshore business corporations, was marketed at seminars at which the defendant and others spoke.  Id. at 1151.  The corporations were ostensibly supposed to be used only to pay business expenses.  But as actually marketed and actually implemented, the corporations were used to hide untaxed income offshore, then repatriate it.  Id.  The conviction of these promoters was also affirmed.

Similarly, in United States v. Barshov, 733 F.2d 842, 846 (11th Cir. 1984), the Eleventh Circuit affirmed Klein conspiracy convictions against promoters of a tax shelter.  The gist of the shelter was to overstate depreciation costs and investment credits in the movie distribution business.  Id. at 845.  The defendants were general partners in the partnerships that were the vehicle for the fraudulent deductions; clients were limited partners.  Although the tax scheme in

that case was less facially fraudulent than those in <u>Scott</u> or the instant case, <u>Barshov</u> is important

for present purposes because it signifies that the Eleventh Circuit has approved a <u>Klein</u>

conspiracy conviction based, in part, on the promotion of fraudulent tax schemes.  Ample other

cases reflect that the government has successfully prosecuted promoters of tax schemes and

shelters, of varying degrees of sophistication, for <u>Klein</u> conspiracy.[7]  Prosecution for a <u>Klein</u>

conspiracy based on the joint promotion of fraudulent tax schemes is nothing new; in fact, it is

entirely unremarkable.

    In sum, the Hirmers, Merino, Casternovia, and Pendell all marketed bogus tax products in

PQI's shopping mall of fraud.  Claudia Hirmer also had the last word on who could set up shop

in that mall.  PQI's asset protection products were designed to conceal income and assets from

the IRS by giving the false appearance that clients did not own or control their assets.  Cases like

<u>Scott</u> and <u>Bedford</u> have validated <u>Klein</u> conspiracy convictions in similar circumstances.  And

their reasoning is persuasive.  Products with the express purpose of helping a client to "own

nothing, control everything" are inherently dishonest and obstructive.  So is a warehouse bank.

When these products are implemented against the backdrop of other PQI vendors who

encouraged non-filing and non-payment of taxes, the purpose of these "asset protection"

products becomes all the more apparent.  They were intended to impede, impair, and obstruct the

IRS from computing and collecting the taxes of PQI clients and of the defendants themselves.

Several defendants' promotion of PQI products designed to create a paper trail of supposed good

---

[7] <u>See</u> <u>United States v. Iles</u>, 906 F.2d 1122, 1124 (6th Cir. 1990) (promotion and sale of
tax shelters); <u>United States v. Crooks</u>, 804 F.2d 1441, 1448 (9th Cir. 1986) (promotion and sale
of bogus royalty-based tax shelter to create deductions devoid of economic substance); <u>United
States v. Little</u>, 753 F.2d 1420, 1427 (9th Cir. 1985) (promotion and sale of real estate tax
shelters).

faith – Bill Benson and IMF Decoder – also shows the unlawful purpose of the conspiracy.  The

very fact that such a paper trail was thought to be necessary manifests an unlawful purpose – the

marketers understood that non-filing and non-payment of taxes, as encouraged by Benson and

Decoder, would result in legal trouble.  Driven by greed and ideology, the defendants would not

be deterred from marketing their wares despite the overwhelming evidence that they were on the

wrong side of the law.  The motions for judgment of acquittal on the first object of count one

should be denied.

 

Respectfully submitted,

THOMAS F. KIRWIN
United States Attorney

/s/ Jonathan R. Marx
MICHAEL J. WATLING
ADAM F. HULBIG
JONATHAN R. MARX
Trial Attorneys
U.S. Department of Justice
601 D Street, NW
Washington, DC 20004
Telephone:     (202) 616-9307
              (202) 514-6061
              (202) 307-3901
Attorneys for the United States of America

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 21, 2010, a true and correct copy of the foregoing has been furnished via CM/ECF filing to the Clerk of Court, which will send notification of such filing to the parties of record, and via electronic mail to *pro se* defendants Mark Leitner at falselyaccused71@aol.com and Michael Leonard at mleonard4@nycap.rr.com.  *Pro se* defendants Dover Perry and Arnold Manansala will be served in court on March 22, 2010.


/s/ Jonathan R. Marx
Jonathan R. Marx
Trial Attorney, Tax Division
Criminal Enforcement Section
U.S. Department of Justice