UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

v.                                    Case Nos.:   3:08cr79/MCR/CJK
                                                   3:15cv282/MCR/CJK

CLAUDIA CONSTANCE HIRMER,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

Defendant Claudia Constance Hirmer has filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (ECF No. 1834). The Government filed a response in opposition, and Defendant filed a reply. (ECF Nos. 1885, 1914). It is the opinion of the undersigned that Defendant's motion should be denied.

## BACKGROUND and ANALYSIS

In August 2008, Defendant, her husband Mark Hirmer, and eleven other individuals were indicted for various crimes, including a dual-object conspiracy to defraud the United States and to commit wire fraud in violation of 18 U.S.C. §§ 371 and 1343 (count one); a separate conspiracy to commit money laundering in violation

of 18 U.S.C. § 1956(a) and (h) (count two); and attempt to evade income taxation in violation of 26 U.S.C. § 7201 (count three). (ECF No. 3). The indictment also included additional wire fraud counts which the Government moved to dismiss before trial. (*See* ECF No. 819). Jeffrey Dickstein jointly represented the Hirmers after a hearing pursuant to *United States v. Garcia*, 577 F.2d 272 (5th Cir. 1975),[1] and the Hirmers' written waiver of their rights to conflict-free counsel. (ECF Nos. 188, 208, 220). After a month-long trial, the jury found Defendant guilty on all counts on March 31, 2010. (ECF No. 1152). Dickstein withdrew from the case after the conviction, and Richard Greenberg represented Defendant at a sentencing hearing held on October 27, 2010. On November 16, 2010, the district court sentenced Defendant to 60 months' imprisonment as to counts one and three, and 240 months as to count two, all to run concurrently, followed by three years of supervised release. (*See* ECF Nos. 1512, 1513, 1535). The Eleventh Circuit Court of Appeals affirmed Defendant's conviction and sentence. *United States v. Merino*, 545 F. App'x 867 (11th Cir. 2013) (per curiam).

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

**General Standard of Review**

Collateral review is not a substitute for direct appeal, and therefore the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited.  A prisoner is entitled to relief under § 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack.  *See* 28 U.S.C. § 2255(a); *McKay v. United States*, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011).  "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'"  *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted).  The "fundamental miscarriage of justice" exception recognized in *Murray v. Carrier*, 477 U.S. 478, 496 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent . . . ."

The law is well established that a district court need not reconsider issues raised in a § 2255 motion which have been resolved on direct appeal.  *Stoufflet v. United States*, 757 F.3d 1236, 1239 (11th Cir. 2014); *Rozier v. United States*, 701

F.3d 681, 684 (11th Cir. 2012); *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000); *Mills v. United States*, 36 F.3d 1052, 1056 (11th Cir. 1994). Once a matter has been decided adversely to a defendant on direct appeal, it cannot be re-litigated in a collateral attack under § 2255. *Nyhuis*, 211 F.3d at 1343 (quotation omitted). Broad discretion is afforded to a court's determination of whether a particular claim has been previously raised. *Sanders v. United States*, 373 U.S. 1, 16 (1963) ("identical grounds may often be proved by different factual allegations . . . or supported by different legal arguments . . . or couched in different language . . . or vary in immaterial respects").

Furthermore, a motion to vacate under § 2255 is not a substitute for direct appeal, and issues which could have been raised on direct appeal are generally not actionable in a § 2255 motion and will be considered procedurally barred. *Lynn*, 365 F.3d at 1234-35; *Bousley v. United States*, 523 U.S. 614, 621 (1998); *McKay v. United States*, 657 F.3d 1190, 1195 (11th Cir. 2011). An issue is "'available' on direct appeal when its merits can be reviewed without further factual development." *Lynn*, 365 F.3d at 1232 n.14 (*quoting Mill*s, 36 F.3d at 1055). Absent a showing that the ground of error was unavailable on direct appeal, a court may not consider the ground in a § 2255 motion unless the petitioner establishes (1) cause for not raising

the ground on direct appeal, and (2) actual prejudice resulting from the alleged error, that is, alternatively, that she is "actually innocent." *Lynn*, 365 F.3d at 1234; *Bousley*, 523 U.S. at 622 (citations omitted). To show cause for procedural default, a petitioner must show that "some objective factor external to the defense prevented [her] or [her] counsel from raising [her] claims on direct appeal and that this factor cannot be fairly attributable to [petitioner's] own conduct." *Lynn*, 365 F.3d at 1235. A meritorious claim of ineffective assistance of counsel can constitute cause. *See Nyhuis*, 211 F.3d at 1344.

Ineffective assistance of counsel claims are generally not cognizable on direct appeal and are properly raised by a § 2255 motion regardless of whether they could have been brought on direct appeal. *Massaro v. United States*, 538 U.S. 500, 503 (2003); *see also United States v. Franklin*, 694 F.3d 1, 8 (11th Cir. 2012); *United States v. Campo*, 840 F.3d 1249, 1257 n.5 (11th Cir. 2016). In order to prevail on a constitutional claim of ineffective assistance of counsel, a petitioner must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that she was prejudiced by this inadequacy. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Williams v. Taylor*, 529 U.S. 362, 390 (2000); *Darden v. United States*, 708 F.3d 1225, 1228 (11th Cir. 2013). In applying

*Strickland*, the court may dispose of an ineffective assistance claim if a petitioner fails to carry her burden on either of the two prongs. *Strickland*, 466 U.S. at 697; *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("[T]he court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa."). In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688; *see also Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007). Reviewing courts are to examine counsel's performance in a highly deferential manner and "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Hammond v. Hall*, 586 F.3d 1289, 1324 (11th Cir. 2009) (*quoting Strickland*, 466 U.S. at 689); *see also Chandler v. United States*, 218 F.3d 1305, 1315-16 (11th Cir. 2000) (discussing presumption of reasonableness of counsel's conduct); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). Counsel's performance must be evaluated with a high degree of deference and without the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. To show counsel's performance was unreasonable, a petitioner must establish that "no

competent counsel would have taken the action that [her] counsel did take." *Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008) (citations omitted); *Chandler*, 218 F.3d at 1315. "[T]he fact that a particular defense ultimately proved to be unsuccessful [does not] demonstrate ineffectiveness." *Chandler*, 218 F.3d at 1314. When reviewing the performance of an experienced trial counsel, the presumption that counsel's conduct was reasonable is even stronger, because "[e]xperience is due some respect." *Chandler*, 218 F.3d at 1316 n.18.

Regarding the prejudice requirement, a petitioner must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (*quoting Strickland*). For the court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle [her]." *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). A petitioner therefore must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 369 (*quoting Strickland*, 466 U.S. at 687). To establish ineffective assistance,

a petitioner must provide factual support for her contentions regarding counsel's performance. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *See Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1333-34 (11th Cir. 2012).

The law is well-established that counsel is not ineffective for failing to preserve or argue a meritless claim. *Denson v. United States*, 804 F.3d 1339, 1342 (11th Cir. 2015) (*citing Freeman v. Attorney General, Florida*, 536 F.3d 1225, 1233 (11th Cir. 2008)). This is true regardless of whether the issue is a trial or sentencing issue. *See*, *e.g.*, *Sneed v. Fla. Dep't of Corr.*, 496 F. App'x 20, 27 (11th Cir. 2012) (failure to preserve meritless *Batson* claim not ineffective assistance of counsel); *Lattimore v. United States*, 345 F. App'x 506, 508 (11th Cir. 2009) (counsel not ineffective for failing to make a meritless objection to an obstruction enhancement); *Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit); *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) (counsel not ineffective for failing to object to "innocuous" statements by prosecutor, or accurate statements by prosecutor about effect of potential sentence); *Meeks v. Moore*, 216 F.3d 951, 961 (11th Cir. 2000) (counsel not ineffective for

failing to make meritless motion for change of venue); *Jackson v. Herring*, 42 F.3d

1350, 1359 (11th Cir. 1995) (counsel need not pursue constitutional claims which he

reasonably believes to be of questionable merit); *United States v. Winfield*, 960 F.2d

970, 974 (11th Cir. 1992) (no ineffective assistance of counsel for failing to preserve

or argue meritless issue); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989)

(counsel was not ineffective for informed tactical decision not to make what he

believed was a meritless motion challenging juror selection procedures where such

a motion has never been sustained).

An evidentiary hearing is unnecessary when "the motion and files and records

conclusively show that the prisoner is entitled to no relief." *See* 28 U.S.C. § 2255(b);

*Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008).  Not every claim of

ineffective assistance of counsel warrants an evidentiary hearing.  *Gordon*, 518 F.3d

at 1301 (*citing Vick v. United States*, 730 F.2d 707, 708 (11th Cir. 1984)).  To be

entitled to a hearing, a petitioner must allege facts that, if true, would prove he is

entitled to relief.  *See Hernandez v. United States*, 778 F.3d 1230, 1234 (11th Cir.

2015).  A hearing is not required on frivolous claims, conclusory allegations

unsupported by specifics, or contentions that are wholly unsupported by the record.

*See Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014)

(explaining that "a district court need not hold a hearing if the allegations [in a § 2255 motion] are . . . based upon unsupported generalizations") (internal quotation marks omitted); *Peoples v. Campbell*, 377 F.3d 1208, 1237 (11th Cir. 2004). Even affidavits that amount to nothing more than conclusory allegations do not warrant a hearing. *Lynn*, 365 F.3d at 1239. Finally, disputes involving purely legal issues can be resolved by the court without a hearing. The undersigned finds that an evidentiary hearing is not warranted in this case.

**Statement of Facts**

This case involves the activities of Pinnacle Quest International ("PQI"), an organization that operated a marketplace for a variety of vendors, many of whom promised that their schemes or products could eliminate one's income tax liability and credit card debt. Other vendors promised to hide assets from the Internal Revenue Service ("IRS") or other creditors. PQI marketed three membership levels: at the Q1 level a member received a set of CDs containing recordings by various PQI vendors; at the Q2 level, members purchased a ticket for approximately $7,500 to attend an offshore conference where vendors made live presentations; and at the Q3 level, members purchased a ticket for approximately $18,750 to attend an offshore conference where additional information and speakers were available.

Case Nos.: 3:08cr79/MCR/CJK; 3:15cv282/MCR/CJK

The Government presented evidence that Defendant functionally controlled PQI as a founder and member of PQI's Executive Council, marketed the products offered by PQI, and used the products herself to hide business profits from the IRS in order to evade taxation. PQI was a successor organization to the Institute of Global Prosperity ("Global"), which ceased operations in 2002. Defendant and several of her co-defendants were involved with Global.

From 2002 to 2008, Defendant and her husband earned over $14 million selling PQI memberships and vendor products. During that six-year period, Defendant did not file tax returns and only paid a few hundred dollars in federal income taxes. The IRS conducted an audit of the Hirmers in 2006, following which the IRS assessed almost $2 million in taxes, penalties and interest against Defendant. The Government presented evidence that, after receiving notification of this tax debt, Defendant began hiding her assets.

At trial, Defendant testified she and others created PQI for the purpose of educating people on a variety of topics, "to share the truth on many different levels," not to cheat the customers of PQI or to defraud the IRS. (ECF No. 1463 at 18). She testified that clients were advised that they should conduct their own research and undertake due diligence before taking any particular course of action which may have

been recommended by PQI vendors.  Defendant explained that she believed she did not owe any taxes and that she did not obtain or hide any illegal funds.  At trial Defendant claimed that she did not pay her taxes because of her belief that she could not sign a 1040 form because she "felt like I would be committing perjury."  (ECF No. 1466 at 124).

**Defendant's Claims**

A.    Ineffective Assistance of Trial Counsel

Defendant raises a number of ineffective assistance of counsel claims related to her trial counsel's representation.  The law governing claims of ineffective assistance of counsel is addressed *supra*.

i.    Money laundering count

In paragraphs one through thirteen of her motion, Defendant argues that her trial counsel rendered ineffective assistance when he failed to challenge that the Government had not established the necessary elements of money laundering, specifically design and intent to conceal.  (ECF No. 1834 at 33-35).  Defendant argues that conspiracy to commit money laundering requires the Government to prove guilt under the heightened standard announced in *Cuellar v. United States*, 553 U.S. 550, 567 (2008) (holding that a conviction under 18 U.S.C. § 1956(a)(2)(B)(i)

requires evidence that a defendant concealed money to hide the nature or source of funds, not just to conceal the money itself).[2]

As part of the Government's case-in-chief, Wayne Hicks testified that he established and managed Interactive Currency Interface System Money Orders ("MYICIS"), a "warehouse bank" that maintained a single, pooled account at a commercial bank for all of its 3,000 customers. (ECF No. 1443 at 226-27; 231-32). Although it appeared that MYICIS owned the money in the account, Hicks and his staff maintained records of sub-accounts within the pooled account for each MYICIS customer. At trial, Hicks admitted that he "didn't require you to give a Social Security Number or prove identification" in order to open an account. (ECF No. 1443 at 226-27). He testified the benefit in this arrangement was that the IRS "could not see what [customers] were doing with their money." (*Id*. at 227). Hicks testified, "to be perfectly honest, we assisted people to conceal and disguise the nature, location, source, ownership, and control of money. This is what we did." (*Id*. at 231). Defendant argues her counsel should have argued that she did not utilize MYICIS for the purpose of concealing the nature, source or ownership of funds under

---

[2] Section 1956(a)(2)(B)(i) provides that a defendant is guilty of money laundering where she conducts a financial transaction involving the proceeds of an unlawful activity, "knowing that the transaction is designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

Case Nos.: 3:08cr79/MCR/CJK; 3:15cv282/MCR/CJK

the *Cuellar* standard. A review of the record demonstrates that trial counsel argued throughout the trial that Defendant did not attempt to conceal the source or ownership of any funds earned through PQI. During his direct examination of Defendant, trial counsel asked her why she opened a MYICIS account, and she testified that they "started using it for the purpose of product purchase for clients" after a lot of clients indicated that they wanted to use it for transactions. (ECF No. 1467 at 28). Defendant testified that MYICIS accepted Canadian money orders and international checks which could not be deposited in a Panamanian account which PQI had opened. (*Id*. at 32). Defendant also testified that there were times when her husband would write a check over $10,000, and "[w]e didn't worry about structuring to prevent a reporting to the Internal Revenue Service." (*Id*. at 42).

Counsel also filed a Rule 29 motion for acquittal arguing that the Government had to prove that the purpose of the identified financial transactions was to conceal the nature, location, source or ownership of the funds. The motion stated, "[t]here is no evidence that the Hirmers cashed checks or money orders from purchasers of the PQI products, or accepted cash payments, and then deposited that cash into accounts not held in their name for the purpose of concealing where the cash came from or where the cash was going. . . In the absence of any proof of financial transactions

designed to conceal the source of the funds, there is insufficient evidence for Count 2 to go to the jury." (ECF No. 1101 at 8). Although trial counsel did not reference *Cuellar* in the motion specifically, he argued its holding – that the purpose of concealing funds must be to hide the source of the funds. The court denied the motion, stating:

> Mr. Hicks testified that the MYICIS program was designed to assist customers in concealment and concealing and disguising the nature, location, source, and ownership of-and control of the money. He said that was the purpose. And the jury can certainly accept his testimony or reject it, but this is a motion for judgment of acquittal, and there is enough evidence taken in the light most favorable to the government to send this to the jury.

(ECF No. 1450 at 10). In his closing argument counsel argued, "[t]his case is about conspiracy to commit money laundering when there is absolutely no single financial transaction designed to hide anything, at least by the Hirmers." (*Id.* at 133).

Trial counsel challenged the Government's evidence as to the money laundering charge by presenting testimony that Defendant did not conceal the nature and source of the funds at issue utilizing MYICIS or any other method during her testimony, in a Rule 29 motion, and during closing argument. Defendant has not demonstrated ineffective assistance of counsel under *Strickland*.

In paragraphs 25 through 27, Defendant argues that her lawyer did not object to the jury instructions regarding money laundering and did not argue for the heightened standard under *Cuellar*. The record contradicts this assertion. As to count two, the court instructed the jury that money laundering means in part "that the defendant engaged in the financial transaction knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the funds or property." (ECF No. 1450 at 54-55). At counsel's request, the court instructed the jury further:

> If you find there were illegal proceeds from wire fraud, I instruct you that where the defendant simply spends the illegal proceeds and did not intend to conceal or disguise the nature, location, source, ownership, or control of the funds, then the defendant did not engage in money laundering or a conspiracy to commit money laundering.

(*Id.* at 56-57). The record confirms that Defendant's counsel argued for a supplemental jury instruction based on *Cuellar*. (*See* ECF No. 945 at 28, Hirmer's Proposed Jury Instructions (2nd Set)).

In his testimony, Hicks explicitly testified that he designed MYICIS so that each customer's funds and transactions could not be easily linked to them. Enough evidence existed in the record for the jury to find that Defendant intended to conceal the nature, source and ownership of the funds at issue. *See United States v. Kresler*,

392 F. App'x 765, 775-76 (11th Cir. 2010) (holding that evidence that defendants

directed deposit of profits into accounts other than their own personal accounts was

sufficient for jury to infer that the only purpose was to conceal the nature and source

of funds).   Defendant has demonstrated neither deficient performance nor prejudice

under *Strickland*.

   ii. Constructive amendment of the indictment

   On January 14, 2010, the Government moved to dismiss counts four through

fifteen of the indictment, all of which alleged wire fraud.  (ECF No. 728).  The court

granted the dismissal with prejudice.  (ECF No. 819).  In paragraphs 14 through 16

of her motion, Defendant argues that her trial counsel should have argued that the

dismissal of the wire fraud counts resulted in a constructive amendment to the

indictment, resulting in the removal of a scheme to defraud from the indictment.

   In order to sustain a conviction for conspiracy under 18 U.S.C. § 371, the

Government must prove "(1) *the existence of an agreement* to achieve an unlawful

objective; (2) the defendants' *knowing and voluntary* participation in the agreement;

and (3) the *commission of an act* in furtherance of the agreement."  *United States v.

Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998) (emphasis in original) (citation

omitted). Defendant and her co-defendants were charged with a dual-object

conspiracy to impede the assessment and collection of taxes by the IRS and to defraud PQI customers. Count one of the original indictment charged Defendant with this dual-object conspiracy and alleged both the scheme to defraud and numerous overt acts committed in furtherance of the fraud, including wire fraud. (ECF No. 3 at 6-23). Count one of the corrected indictment charged Defendant with the identical dual-object conspiracy and outlined numerous overt acts committed in furtherance of the scheme, including wire fraud. (*See* corrected Indictment, ECF No. 728-1 at 1-20).

Fed. R. Crim. P. 48(a) provides that "the government may, with leave of court, dismiss an indictment, information, or complaint." The withdrawal of distinct portions of an indictment is permissible if the effect is to narrow the issues that a defendant must defend. *See Salinger v. United States*, 272 U.S. 542 (1926). The Government did not add anything to the corrected indictment so as to constructively amend it, and the dismissal of counts four through fifteen did not amend the indictment to remove the essential elements of the scheme from the indictment. *See United States v. Diaz*, 690 F.2d 1352, 1356 (11th Cir. 1982) (citing *Salinger* and stating that "[t]he Supreme Court has held that withdrawing a part of a charge from the consideration of the jury does not work an amendment of the indictment, provided

nothing is thereby added to the indictment."). The Government correctly notes that *Adkinson*, *supra*, is inapposite because in that case the dismissal of one count of the indictment omitted an essential element of the offense. (ECF No. 1885 at 10-11, n.1). The Government's dismissal of certain wire fraud counts charged in the original indictment did not result in the omission of the essential elements of the conspiracy charged against Defendant. Trial counsel's failure to make a meritless argument is not deficient performance under *Strickland*.

### iii. Failure to subpoena certain witnesses

In paragraph 17, Defendant alleges trial counsel should have subpoenaed various attorneys who reviewed PQI's products and "rendered an opinion as to the quality and legitimacy of the product." (ECF No. 1834 at 35). In her motion Defendant did not identify these attorneys. In her reply, Defendant identifies these attorneys as Lowell Becraft, Robert Bernhoft and Robert Barnes, all of whom she says attended PQI events and rendered legal opinions during these conferences. (ECF No. 1914 at 8). Becraft supposedly told Defendant and the Executive Council "at a Q2 Conference nothing PQI was doing was 'illegal.'" (*Id.*). Bernhoft and Barnes allegedly "both agreed the government would not like what some of the speakers were 'saying,' [but] there was nothing 'illegal' being done." (*Id.* at 9). Defendant

states that one or more of these attorneys reviewed client contracts which participants signed before attending PQI events which stated that PQI did not endorse any product or service. Defendant believes these attorneys would have provided evidence that she did not act with any criminal intent.

A review of the trial transcript shows that trial counsel's defense strategy centered on Defendant's good faith belief that her actions were legal, and thus she lacked the specific intent to defraud. In his opening, trial counsel argued:

> Bottom line, the evidence is going to show that Claudia and Mark Hirmer investigated everything. They did nothing on a whim. They, totally, 100 percent, believed in all their heart that everything they were doing was legal, that they had no intent to violate any laws, and they certainly didn't agree with anyone else to violate the law. And at the end of this case, we expect that the evidence is going to prove that all of their conduct was protected by the First Amendment, and we're going to ask you to vote not guilty.

(ECF No. 1438 at 75). Defendant testified at length about the extensive legal research she did to form her beliefs. (*See e.g.*, ECF No. 1464 at 52-67; 73-89; ECF No. 1466 at 18-44). She testified, "I looked up Supreme Court cases, congressional documents, laws and treaties. I researched statutes, regulations. I researched a lot of case history regarding exactly what is direct taxes versus indirect taxes." (ECF No. 1466 at 19-20). At one point during her direct testimony, Defendant also stated, "I didn't rely on anyone's opinions. They may have given it to me, but I would have

verified in research on my own that those opinions were accurate." (*Id*. at 44). She testified, "my understanding and belief is after researching everything and everyone liable throughout Title 26, I did not find any activity that my husband and I were involved with that would fall under 'gross income' as defined under – well, as listed under 6012." (*Id*. at 50-51).

At one point during his direct examination, trial counsel asked Defendant if she had ever consulted Becraft with respect to an issue, and Defendant responded that she had. Before she could answer more fully, the court intervened and expressed concern at a bench conference that counsel's questions would cause Defendant to testify to hearsay statements from this attorney. (ECF No. 1466 at 77-78). The Government's counsel also expressed concern about a "backdoor . . . reliance on counsel argument." (*Id.* at 78). Trial counsel affirmed that he had not asked for a reliance on attorney jury instruction. (*Id*. at 79). At a sidebar during another portion of the trial, counsel commented that he thought Defendant would be asked on cross-examination "why she didn't hire lawyers and accountants to get her questions answered, and she's going to say because I know when you rely on them you can get convicted anyway." (ECF No. 1463 at 110). Because the defense's strategy did not encompass a reliance on counsel argument, counsel's decision not to call any attorneys as witnesses is not

unreasonable.  The decision on which witnesses to call is a strategic one which courts do not generally second guess.  *See Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) ("Which witnesses, if any, to call and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."); *Solomon v. Kemp*, 735 F.2d 395, 404 (11th Cir. 1984) ("While attorneys may disagree as to how many or what particular witnesses to call, such is the stuff out of which trials are made.").  Defendant has not demonstrated deficient performance or prejudice by showing that if one or more of these attorneys had been called as a witness, there is a reasonable probability the outcome of the trial would have been different.

In paragraphs 19 and 38, Defendant argues that counsel should have called Bill Benson as a witness who "would have testified as to [her] understanding of his product, [her] research of said product, [her] marketing of said product and the conversations thereto."  (ECF No. 1834 at 36).  Benson sold a product referred to as a "Reliance Defense Program" and a "16th Amendment Reliance Program" which were based on the (false) premise that the Sixteenth Amendment had not been properly ratified by all of the states, so customers could stop paying federal income taxes and avoid or defeat prosecution by relying on the materials in his packages.  A

district court in Illinois had enjoined Benson from promoting, organizing or selling these packages. *See United States v. Benson*, 561 F.3d 718 (7th Cir. 2009). Previously, Benson had been convicted of willful failure to file income tax returns and tax evasion and had served time in prison. *See United States v. Benson*, 67 F.3d 641 (7th Cir. 1996).

Defendant filed a pretrial motion to dismiss counts one and three of the indictment based on the argument that the Sixteenth Amendment had not been properly ratified, so it is not effective against citizens of the United States. (ECF No. 305). The district court denied the motion to dismiss, noting this argument had been rejected by numerous courts. (ECF No. 491 at 6); *see e.g.*, *Pollard v. Commissioner*, 816 F.2d 603, 604 (11th Cir. 1987) (finding the argument that the Sixteenth Amendment had never been ratified "frivolous"); *Stubbs v. Commissioner*, 797 F.2d 936, 938 (11th Cir. 1986) (finding that even if the Sixteenth Amendment argument had been properly raised, it is without merit); *Miller v. United States*, 868 F.2d 236, 241 (7th Cir. 1989). Trial counsel sought a writ of mandamus from the Eleventh Circuit after the denial of the motion to dismiss. The Eleventh Circuit denied the writ, and the Supreme Court denied certiorari. (*See* ECF Nos. 622, 758). At trial, the court prohibited Defendant from attempting to prove the unconstitutionality of the

Sixteenth Amendment and denied trial counsel's request to admit some 17,000 pages

of material by Benson in support of his beliefs. (ECF No. 1466 at 161-163).

Theresa Hampton, an undercover IRS agent, testified about PQI and the

third-party vendors listed on its website. Benson was listed as a vendor, and the

reliance defense package was described as follows: "[t]he research contained in the

reliance defense package will help you establish a belief in solid reliance defense with

regard to the Sixteenth Amendment and other issues in the event you decide not to

file an income tax return or want to protect your assets." (ECF No. 1438 at 128).

One of the CDs sold by PQI was entitled "The Truth About Taxes" by Benson in

which he discussed the Sixteenth Amendment not being ratified. (*Id.* at 151.). The

Government played a clip of this CD for the jury. (*Id.*).

Defendant testified that her personal belief after researching the issue is that

"through [Benson's] certified documentation, that he was telling the truth regarding

the ratifications of the Sixteenth Amendment not being properly ratified." (ECF No.

1466 at 107). Defendant also testified that PQI presented different positions with

regard to the ratification of the Sixteenth Amendment because:

> We felt that it fell under the First Amendment free speech where people
> can give their opinions. They may not be necessarily on the same page
> with it, but it allowed people to think, do their own research, come to
> their own conclusions and just expands their minds into what could

possibly be and dig deeper and just realize stuff they may never have
heard before.

(*Id*. at 110). On cross-examination, Defendant testified that Benson's reliance

defense product and other PQI products were designed for PQI customers "to do

research so they could come to their own conclusion if they were not liable for a tax."

(*Id*. at 156). Defendant testified that she bought Benson's package, but not for the

purpose of avoiding being taken to court. (*Id*. at 141). The Government also asked

whether Benson's product was marketed for the purpose of shielding a customer from

criminal prosecution. Defendant testified, "[n]ot necessarily. That was one aspect

of it. There were Canadians that bought his product, so there were different purposes.

That was one that he said, that they will not take it into a courtroom. That was one

thing he said about it, that you can rely on this information, they are certified

government documents, and no courtroom will accept it." (*Id*. at 141-42). On

redirect, Defendant testified that an alternative reason for purchasing Benson's

reliance defense product was for research purposes. (ECF No. 1467 at 11).

There is ample evidence in the record that Defendant testified as to her

understanding of the reliance defense package and possible reasons a customer would

purchase it. She has not shown trial counsel needed to call Benson as a witness to

present this information. In addition, Defendant admitted Benson had been convicted

of a felony tax offense prior to researching and packaging his product. (*See* ECF No. 1466 at 135). Given Benson's conviction for tax crimes and the court's refusal to allow a Sixteenth Amendment defense, trial counsel's decision not to call him as a witness is not unreasonable, or even seriously questionable. Defendant has not demonstrated ineffective assistance of counsel in failing to call Benson as a defense witness.

iv. Closing argument

In paragraph 20, Defendant claims that trial counsel failed to raise the most appropriate closing argument and "inflamed the jury" during his closing. (ECF No. 1834 at 36). In her motion, Defendant does not cite any portion of the record to support her claim. In her reply, Defendant cites an instance in the record where the court sustained an objection to statements made by counsel in his closing remarks suggesting the Government had committed fraud. (ECF No. 1914 at 10). (*See* ECF No. 1450 at 120-22). Although the court did admonish counsel for making these implications, it did so during a sidebar outside of the jury's hearing. Defendant also believes counsel should have taken the opportunity to "regroup" after the court offered him time to do so.

Defendant argues that in his closing counsel should have distinguished Global from PQI in an effort to show "the vast differences between the groups." (ECF No. 1914 at 10). A review of counsel's closing shows he argued the Government failed to present evidence of Defendant's guilt to any of the crimes charged. He argued PQI's mission was to educate the public, not to defraud anyone. Counsel argued Defendant had a good faith belief through her extensive research that the tax laws are valid, but did not apply to her. Counsel also argued Defendant did not use false names or otherwise attempt to hide her assets. For instance, he stated:

> The government wants you to believe that [the Hirmers] are crooks. That they are doing something criminal. They are engaging in financial transactions. They are trying to hide the source of funds.
>
> I would submit, ladies and gentlemen, they are doing just the opposite. They are leaving a wide, long paper trail and have never tried to cover up anything. And that's the opposite of money laundering. And certainly, the opposite of a conspiracy to commit money laundering.

(ECF No. 1450 at 130). A review of the closing does not demonstrate any instance in which counsel's argument inflamed the jury.

Defendant has not demonstrated that counsel made a closing argument no competent counsel would have made. The fact that she would, in hindsight, have preferred a different emphasis or have made different arguments is not salient. Defendant has not demonstrated deficient performance or resulting prejudice in this

claim.

v.     Failure to object or respond to objections

In paragraph 18, Defendant alleges her trial counsel was not "prepared on what type of hearsay exception existed, which would allow him to have submitted at least one letter in which the petitioners' relied upon for the validity of the product sold." (ECF No. 1834 at 36).  Specifically, Defendant references Hirmer Exhibit 173, a document from the Florida Department of State recognizing her husband's application for a fictitious name registration doing business as MCD Productions. Trial counsel attempted to admit this document into evidence, but the Government objected on the basis of hearsay.  (*See* ECF No. 1466 at 74).  Trial counsel argued that "under rules of circumstantial evidence, [the document is] sufficiently trustworthy." (*Id*. at 75).  The court sustained the objection, noting trial counsel had not argued a recognized exception to the hearsay rule.  Whether or not Defendant has demonstrated deficient performance with regard to this exhibit, Defendant has not established how this failure prejudiced her case.  An exhibit merely acknowledging a fictitious name registration does not establish in any way the validity of the PQI products sold, and certainly does not put some official imprimatur on the same.

As to counsel's failure to make objections, in her reply Defendant states that page limitations prevent her from citing numerous instances where counsel should have made proper objections. She states counsel "either argued without citation, or argued incorrect rules, or sat silent when he should have objected." (ECF No. 1914 at 12). She points to two examples where counsel either failed to introduce evidence because the Government objected on hearsay grounds or failed to reference an exhibit which she alleges helped her defense. (*See id.* at 13 n.7). Defendant argues trial counsel did not act reasonably after the court limited the exhibits she wanted to introduce into evidence to support her good faith defense. Even if these failures amount to deficient performance, Defendant has failed to prove the prejudice prong of *Strickland*. She has not demonstrated that had counsel had certain exhibits admitted into evidence or argued more effectively referencing certain admitted exhibits that the outcome of the proceeding would have been different.

In paragraph 22, Defendant incorporates all of her ineffective assistance claims and states that had her counsel explained a bench trial properly, she would have sought a bench trial with stipulated facts, and the outcome would have been different. Defendant does not support her allegations with any particular elaboration. The court denied a motion for acquittal, affirming that sufficient evidence existed for the finder

of fact to find guilt on each count of the indictment. (*See* ECF No. 1450 at 5-13).

Defendant has not demonstrated that had she chosen a bench trial, the outcome would

have been different.

    vi.    Failure to properly contest the elements of the offenses

In paragraph 23, Defendant asserts she was denied effective assistance of

counsel when trial counsel failed to object to the presentation of evidence. But

Defendant does not cite any specific instances in the record to support this claim.

In paragraph 24, Defendant claims trial counsel failed to effectively present

evidence regarding the elements of money laundering and failed to "explain each

element, and to cross examine witnesses." (ECF No. 1834 at 40). Again, however,

Defendant fails to flesh out this claim with any specificity. In her reply, Defendant

argues the Government failed to prove elements of wire fraud, including that there

was no agreement to launder proceeds; that overt acts in a wire fraud conspiracy

cannot be used to prove substantive wire fraud; that there was no proof of a material

misrepresentation or concealment of a material fact to support a wire fraud scheme;

and that there was not one transaction that separated the § 371 from the § 1956(h)

conspiracy. (ECF No. 1914 at 14-16).

Defendant argues that had counsel made the proper arguments, these counts would have been dismissed.  This claim is without merit.  Trial counsel made some of these arguments in his Rule 29 motion, cross-examined witnesses on these points and argued that the Government had not proven its case in his closing argument. Defendant has failed to demonstrate that but for counsel's performance, the outcome of the case would have been different.

In paragraph 32, Defendant claims trial counsel "permitted the jury to believe that all of the overt acts found in the 'five year' conspiracy wire fraud count 1 could constitute the 'predicate offense' of 'wire fraud listed in 1343.'"  (ECF No. 1834 at 44).  Because no predicate act is required for mail fraud in 18 U.S.C. § 1343, this claim is without merit.

In paragraph 33, Defendant alleges counsel should have argued for the dismissal of count two of the indictment because there were no separate transactions listed which distinguished the acts committed in the conspiracy to commit wire fraud and the acts committed in the commission of the conspiracy to commit money laundering.  (ECF No. 1834 at 44).  Count one of the indictment charged a dual-object conspiracy (1) to defraud the IRS and (2) to commit wire fraud by defrauding PQI customers.  In order to convict Defendant of the charges in count one, the

Government had to prove beyond a reasonable doubt: (1) that two or more persons, in some manner, came to a mutual understanding to try to accomplish a common and unlawful plan; (2) that knowing the object of the conspiracy, Defendant willingly participated in the conspiracy with the specific intent to defraud the IRS; (3) that one of the conspirators during the conspiracy committed at least one of the overt acts described in the indictment; and (4) that this overt act was committed in an effort to accomplish some object of the conspiracy. (*See* Court's Instructions to the Jury, ECF No. 1145 at 16). The corrected indictment alleged forty-nine overt acts taken by Defendant and/or her co-conspirators taken in furtherance of this conspiracy (*See* ECF No. 1145-1 at 9-18).

In order to convict Defendant on count two, which charged a conspiracy to launder the proceeds of the wire fraud conspiracy, the Government had to prove: (1) that two or more persons came to a mutual understanding to try to accomplish a common and unlawful plan to commit money laundering designed to conceal the nature, location, source, ownership or control of proceeds of a specified unlawful activity; and (2) that knowing the object of the conspiracy, Defendant voluntarily participated in it, with knowledge that the funds were derived from some form of lawful activity. (*Id*. at 18). The court further instructed the jury that, "[u]nlike in

Count One, where the Government must prove an overt act in furtherance of the alleged conspiracy, the Government need not prove any overt act in furtherance of the conspiracy alleged in Count Two." (*Id.*). Each count of the indictment required proof of a fact that the other did not, and, thus, neither count was subject to dismissal based on the existence of some common facts. *See Blockberger v. United States*, 284 U.S. 299, 304 (1932) (holding that "[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."). Trial counsel's failure to make a meritless argument is not ineffective assistance of counsel.

> vii.    Failure to investigate use of Social Security numbers in Defendant's business

In paragraphs 29 through 31, Defendant claims trial counsel failed to understand and argue the interplay between a Social Security number and a MYICIS account and did not make it clear to the jury that Hicks was compliant with IRS regulations. (ECF No. 1834 at 43). Hicks testified that a MYICIS account did not require the customer to provide a Social Security number or other identification. He testified that one of the benefits of this arrangement was that the IRS "could not see what [customers] were doing with their money." (ECF No. 1443 at 227). Hicks

testified that "[t]he operation of My ICIS was conducted in such a way to avoid having to issue any reports to the government that a bank would have to issue. We--to be perfectly honest, we assisted people to conceal and disguise the nature, location, source, ownership, and control of money. This is what we did." (*Id*. at 231).

Counsel cross-examined Hicks extensively and got Hicks to admit that not everyone used his service to hide money. (*See* ECF No. 1444 at 31-39; 43-51). Hicks testified, "we had a lot of people who were not – who really didn't care about hiding the money. They just didn't trust banks. They kept meticulous records. They requested statements from us periodically. They just did not like banks." (*Id*. at 38-39). In an attempt to demonstrate that Hicks misled his customers, counsel also questioned Hicks about whether he knew that not requesting Social Security numbers was a violation of law while his terms of service stated that MYICIS complied with IRS regulations. (*See* ECF No. 1443 at 305-312). Counsel also got Hicks to admit that he did not have any evidence that Defendant attempted to conceal the purchase of money orders or do anything else that would require a currency transaction report. (*See id.* at 312-13).

The Government's evidence regarding the Defendant's use of a MYICIS account went to prove count two of the indictment that Defendant attempted to conceal the nature, source and ownership of the funds obtained by fraud by utilizing a pooled account that appeared to have one owner. According to Hicks, the fact that MYICIS did not require a customer's Social Security number assisted in keeping an individual's transactions from being reported to the IRS. Even if counsel confused the subject, Defendant has not demonstrated ineffective assistance of counsel in this claim. In denying counsel's Rule 29 motion, the court stated:

> Mr. Hicks testified that the MYICIS program was designed to assist customers in concealment and concealing and disguising the nature, location, source, and ownership of--and control of the money. He said that was the purpose. And the jury can certainly accept his testimony or reject it . . . .

(ECF No. 1450 at 10). Defendant has failed to show counsel's examination of Hicks misled the jury or confused the issue. He brought out evidence favorable to Defendant in his cross-examination. Defendant has not demonstrated that but for counsel's questions about Social Security numbers, the outcome of the proceeding would have been different.

Defendant also argues counsel failed to argue the definition of "wire" in wire fraud. Defendant raised this issue in her direct appeal. The Eleventh Circuit denied

the claim, holding as follows:

> Mark Hirmer also argues for the first time on appeal that his money laundering indictment was deficient, and that there was insufficient evidence thereof, because emails are not wire transmissions for purposes of wire fraud. We review pursuant to the plain error analysis; and error, if any, is not plain or obvious because no court has interpreted the law as Mark Hirmer urges. Moreover, traditional wire transmissions of cash were both alleged and amply proved.

*Merino*, 545 F. App'x at 869.[3]  Counsel is not deficient for failing to make a meritless argument.

### viii.  16th Amendment

In paragraph 37, and 45 through 47, Defendant argues counsel rendered ineffective assistance  because part of his trial strategy relied on the belief that the Sixteenth Amendment had not been ratified, a belief she now claims she did not share.  (ECF No. 1834 at 47).  The Government characterizes this argument as frivolous and disingenuous because Defendant espoused tax protester arguments at trial.  (*See* ECF No. 1885 at 17).  The record reflects Defendant testified that after researching the issue, she understood and believed that the Sixteenth Amendment did not authorize any new taxing powers.  (ECF No. 1466 at 28-29).  She also testified that based on her research she did not believe the Sixteenth Amendment applied to

---

[3] The Eleventh Circuit granted Defendant's motion to adopt Mark Hirmer's appeal, so she effectively raised this issue on appeal.

Case Nos.: 3:08cr79/MCR/CJK; 3:15cv282/MCR/CJK

her even if it had been properly ratified. (ECF No. 1463 at 45). She explained that she considers herself a "sovereign citizen" which means that she lives in one of the fifty states but is not involved in a "federal activity." (*See* ECF No. 1466 at 38-40). Defendant's self-professed trial strategy supported the arguments and strategy employed by trial counsel. Defendant has failed to demonstrate ineffective assistance in this claim. To the extent Defendant is also alleging a conflict of interest as a result of counsel's strategy or personal beliefs regarding the Sixteenth Amendment, this claim must be denied. Defendant has not alleged a legal conflict of interest in this claim.

## Claims Raised and Decided Adversely on Direct Appeal

Defendant raises three claims in her motion which she raised on direct appeal and which the Eleventh Circuit denied. These claims will not be reconsidered on collateral review. *See Nyhuis*, 211 F.3d at 1343 ("The district court is not required to reconsider claims of error that were raised and disposed of on direct appeal."); *Rozier*, 701 F.3d at 684 ("At least where there has been no intervening change in controlling law, a claim or issue that was decided against a defendant on direct appeal may not be the basis for relief in a § 2255 proceeding."); *United States v. Rowan*, 663 F.2d 1034, 1035 (11th Cir. 1981).

In paragraph 21, Defendant argues the prosecutor violated her "fifth amendment right to due process, when he presented facts not argued or presented in evidence concerning (Global) and (PQI) and insinuating that the petitioners were given notice that what was being done was illegal." (ECF No. 1834 at 36). Defendant raised this argument in her direct appeal. (*See* ECF No. 1885, Exhibit 1, Hirmer Brief at 44; 70-74). The Eleventh Circuit denied the claim, holding as follows:

> The evidence was admitted not to show propensity or guilt by association but to prove that the Defendants had knowledge that the similar products sold by the Global defendants were fraudulent. The district court gave limiting instructions in language that was approved by the Defendants. Each defendant remained entirely free to argue to the jury that he had not been aware of those arrests, prosecutions, and convictions. We agree with the district court that, under the facts of this case, the evidence was highly probative. The primary defense was that Defendants did not believe their schemes violated legitimate laws; to the extent the jury found that the instant Defendants' schemes were similar to those employed by the Global defendants, it was highly probative for the jury to hear that federal courts had found that the similar Global schemes were fraudulent and that the Defendants were aware of that. We agree with the district court that the highly probative evidence outweighed the prejudice. Admission of the evidence certainly was not plain error.

*Merino*, 545 F. App'x at 870.

In paragraph 28, Defendant argues her counsel did not object to the jury instruction regarding conspiracy to commit money laundering and "[t]he government

has to burden of showing that the criminally derived property used in monetary transactions was derived from a specified unlawful activity." (ECF No. 1834 at 41). In her direct appeal, Defendant raised a claim that the Government failed to prove that she knew the proceeds with which she conducted or attempted to conduct financial transactions were from some form of illegal activity. (*See* ECF No. 1885, Exhibit 1, Hirmer Brief at 49-54). The Eleventh Circuit summarily rejected Defendant's sufficiency of the evidence challenges, finding "ample evidence" existed to support each conviction. *Merino*, 545 F. App'x at 869.

In paragraph 34, Defendant alleges counsel failed to argue that "proceeds" of unlawful activity cannot include gross receipts. (ECF No. 1834 at 44). Defendant raised this issue on appeal. (*See* ECF No. 1885, Exhibit 1, Hirmer Brief at 47-49). The Eleventh Circuit denied the claim, finding the argument was foreclosed by precedent. *See e.g.*, *United States v. Tobin*, 676 F.3d 1264 (11th Cir. 2012);[4] *United*

---

[4] Even if this claim were subject to review, it is without merit. The Eleventh Circuit held in *Tobin* as follows:

> In *Santos*, the Supreme Court was asked to interpret the term "proceeds" in the context of illegal gambling. *See* 553 U.S. at 509, 128 S. Ct. at 2022-23. Although a plurality of the Court concluded that the term invariably means "profits" rather than receipts, *see id.* at 514, 128 S. Ct. at 2025 (plurality opinion), Justice Stevens reached the narrower conclusion that "[t]he revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not 'proceeds' within the meaning of the money laundering statute." *Id.* at 528, 128 S. Ct. at 2033 (Stevens, J., concurring in the judgment).

*States v. Hill*, 643 F.3d 807 (11th Cir. 2011). *Merino*, 545 F. App'x at 869.

## B.  Conflicts of Interest

In paragraphs 36 through 50, Defendant alleges her counsel labored under "multiple conflict of interests," which adversely affected his performance and prejudiced her case.  (ECF No. 1834 at 47-51).  Specifically, Defendant alleges conflicts based on counsel's relationships with her co-defendants, Dover Perry and Michael Leonard, and unindicted co-conspirators, including Nadine Griffin, David Struckman, and Bill Benson.  Finally, Defendant claims trial counsel had a conflict with a previous employer, the Bernhoft law firm, as well as financial conflicts with her.

---

In *United States v. Demarest*, 570 F.3d 1232 (11th Cir. 2009), we recognized that the Supreme Court's decision in *Santos* was fragmented and that as a result, its precedential value lies only in the narrow conclusion announced in Justice Stevens's concurrence. *Id.* at 1242. Given that the plurality opinion in *Santos* is not binding, and that this case involves the distribution of controlled substances rather than an illegal gambling business, the District Court did not err in refusing to define the term "proceeds" as "profits." *See id.* (noting that *Santos* is inapplicable because the case did not involve an illegal gambling operation)*; see also United States v. Jennings*, 599 F.3d 1241, 1252 (11th Cir. 2010) (same).

*United States v. Tobin*, 676 F.3d 1264, 1288-89 (11th Cir. 2012).  Congress has now amended the money-laundering statute to specifically define "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." (Fraud Enforcement and Regulatory Act of 2009, Pub. L. No. 111-21, § 2(f)(1), 123 Stat. 1617, 1618 (codified at 18 U.S.C. § 1956(c)(9)).

Case Nos.: 3:08cr79/MCR/CJK; 3:15cv282/MCR/CJK

Conflict of interest claims in the context of ineffective assistance of counsel claims are governed by the standard articulated in *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980), in which the Supreme Court held a defendant must demonstrate: (1) that the defense attorney had an actual conflict of interest, and (2) that this conflict adversely affected the attorney's performance. A conflict of interest may arise in either a simultaneous representation context or a successive representation context. The Eleventh Circuit has held that in either circumstance, a defendant must make a showing of "inconsistent interests." *See Smith v. White*, 815 F.2d 1401, 1405 (11th Cir. 1987); *Freund v. Butterworth*, 165 F.3d 839, 859-60 (11th Cir. 1999) (holding that to prove an "actual conflict" hindered a lawyer's performance, a defendant must make a factual showing of inconsistent interests or point to specific instances in record to suggest an actual impairment of the defendant's interests). In a successive representation case, a defendant must show that either "(1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant, or (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case." *Smith*, 815 F.2d at 1405 (noting "generally, it is more difficult to prove that successive representation caused an actual conflict of

interest than that simultaneous representation did so"). To establish counsel's performance was "adversely affected" by the conflict of interest, a defendant must show: "(1) the existence of a plausible alternative defense strategy or tactic that might have been pursued; (2) that the alternative strategy or tactic was reasonable under the facts; and (3) a link between the actual conflict and the decision to forgo the alternative strategy of defense." *Pegg v. United States*, 253 F.3d 1274, 1278 (11th Cir. 2001) (*citing Freund*, 165 F.3d at 860)). To establish an actual conflict, a defendant must demonstrate "something more than a possible, speculative, or merely hypothetical conflict." *Lightbourne v. Dugger*, 829 F2d 1012, 1023 (11th Cir. 1987).

In paragraph 37, Defendant alleges that she and her counsel had conflicting beliefs as to the ratification of the Sixteenth Amendment and that in determining her legal strategy, counsel pursued "his own objectives, under his belief that the sixteenth amendment is not ratified," rather than pursuing her best interests. (ECF No. 1834 at 47). Defendant argues the time and money expended on this "frivolous" defense amounted to ineffective assistance of counsel. (*Id.*). As discussed *supra*, Defendant has not demonstrated that she and her counsel held different opinions about Sixteenth Amendment arguments in tax cases or that she objected to counsel's pursuit of this argument on appeal. The fact that in hindsight (a condition not uncommon in habeas

petitioners) Defendant now claims to have a conflicting view is not supported by the record, but appears instead to reflect dissatisfaction with the guilty verdict. Defendant has not demonstrated a conflict of interest in this claim.

In paragraph 38, Defendant alleges counsel's prior and simultaneous representation of Bill Benson created a conflict of interest because the subject matter of his prior representation of Benson is "substantially related" to hers and that his product "has a directed relationship with petitioners." (ECF No. 1834 at 48). Defendant has not demonstrated inconsistent interests between herself and Benson or that counsel made "a choice between possible alternative courses of action, such as eliciting or (failing to elicit) evidence helpful to one client but harmful to another." *Reynolds v. Chapman*, 253 F.3d 1337, 1343 (11th Cir. 2001) (*citing Smith*, 815 F.2d at 1404)). Defendant has not pointed to any specific instances in the record to suggest an actual impairment of her interests. She claims that if called as a witness Benson would have testified that Defendant did not approve of Benson's reliance package or try to use it as a means to avoid paying taxes. The record reflects that Defendant testified to these facts herself. The failure to call Benson as a witness was addressed and denied *supra*. While Defendant states her counsel put Benson's "liberty" interests above her own, Defendant has not demonstrated that calling

Benson as a witness to testify to her use of the package would have incriminated him or put him at any other risk. Defendant has not demonstrated a conflict of interest in this claim.

In paragraph 39, Defendant alleges counsel had a conflict by simultaneously representing co-defendants Perry and Leonard in a parallel civil case which the Government brought to enjoin them from using false or misleading commercial speech to promote tax-fraud schemes. (*See* Case No. 3:08cv136/RV, ECF No. 27). Counsel represented PQI, Defendant, Perry, Leonard, and others in this civil case, which the court stayed during the pendency of the criminal proceedings at issue here. (Case No. 3:08cv136/RV, ECF No. 117). Perry and Leonard represented themselves at the criminal trial and were appointed stand-by counsel. (*See* ECF No. 1028; 917). In her motion, Defendant does not identify any inconsistent interests with Perry or Leonard or point to any specific instances in the record where her counsel had to choose between such interests. In her reply, Defendant claims that she wished to sever herself from Perry and Leonard based on their promotion of "debt program/products," which she states she objected to PQI promoting. (ECF No. 1914 at 27). She claims that because Perry and Leonard were representing themselves, counsel positioned her to protect his other clients with her testimony, and counsel's

"aggressive approach when crossing the government witnesses drew [her] 'into' their conspiracy instead of 'separating' the Hirmers from their co-defendant's products or marketing techniques." (*Id*.).  Defendant has not specifically identified any portions of the record or provided any other support for these assertions.  Defendant has not proved the existence of a plausible, reasonable alternative defense strategy or tactic that might have been pursued or a link between an actual conflict and the decision to forgo this alternative strategy of defense.  Also, at the *Garcia* hearing, the court cautioned Defendant about her right to conflict-free counsel and specifically referenced the pending civil action.  (*See* ECF No. 1483 at 63-65; 72).  Defendant chose to waive her right to conflict-free counsel, knowing that counsel represented multiple parties in the civil suit.  This, then, appears to be another incident of hindsight.  Defendant has not demonstrated a conflict of interest in this claim.

Defendant also alleges a conflict of interest based on counsel's prior representation of David Struckman, a founder of Global Prosperity and later a member of the Executive Council of PQI.  Counsel represented Struckman in 2007 in a case involving a conspiracy to defraud the United States and tax evasion.  (*See* ECF No. 3 at 2).  Defendant does not make a factual showing of inconsistent interests between her and Struckman or point to specific instances in the record to suggest an

actual impairment of her interests. Also, she does not allege that any confidential information her counsel learned during his prior representation was relevant to her case. In addition, Defendant attended Struckman's trial and knew counsel represented Struckman. She testified she "knew all the circumstances that led up to [Struckman's] indictment, and none of us felt that he was in any way, shape or form guilty of the accusations" even though a jury convicted him of the charges. (ECF No. 1463 at 105; *see also*, ECF No. 1440 at 282-83). Defendant has not demonstrated a conflict of interest in this claim.

In paragraph 40, Defendant claims trial counsel "held divided loyalties" with previous employers and had friendships with other attorneys while representing her. In her motion, she does not give an example or cite to any portion of the record which supports these claims. In her reply, Defendant explains that she used equity in her home for Struckman's defense, which the Government claimed was a sham mortgage in this case, and counsel informed her "that Bernhoft could lose that money, and there was no way that Bernhoft or Barnes would testify on Hirmers' behalf." (ECF No. 1914 at 26). Defendant wanted to call these attorneys to testify that they rendered favorable opinions about PQI to the Executive Council, going to her lack of intent to defraud. She states counsel persuaded her not to call them as witnesses and they had

since changed their opinions. She also claims Becraft recommended that counsel focus on a First Amendment defense, not the unconstitutionality of the Sixteenth Amendment. Defendant has not demonstrated that these allegations, even if true, rise to the level of a conflict of interest. An actual conflict of interest is more than a possible, speculative or merely hypothetical conflict. Defendant has not demonstrated a conflict of interest in this claim.

In paragraphs 41 through 44, Defendant alleges that she and her counsel had "financial conflicts" which resulted in his abandoning her at the conclusion of the trial. The record reflects that on April 26, 2010, prior to sentencing, counsel moved to withdraw from representation. (ECF No. 1192). He made the motion "in light of his not receiving payment for services rendered to date, and the inability of the Hirmers to pay for services to be rendered in the future. . . ." (*Id*. at 3). In response to his motion, the trial court appointed counsel to represent Defendant under the Criminal Justice Act, provided that Defendant and her husband proved indigent. (*See* ECF Nos. 1217, 1224). Counsel filed a motion for reconsideration of that order citing for the first time conflicts of interest and irreconcilable differences, including his representation of others in the stayed civil suit. (ECF No. 1224 at 3). Reluctantly, the court granted counsel's request to withdraw and appointed new counsel for

sentencing. (ECF No. 1243). Subsequently, the Government charged counsel with criminal contempt. (*See* 3:10mc63/MCR). After a hearing, the court adjudged him guilty of willfully violating a court order by refusing to continue representing Defendant based on non-payment of fees. (3:10mc63/MCR, ECF No. 38 at 4). As to counsel's claims of conflicts of interest, the court found "all of Dickstein's subsequent attempts to justify his conduct to be pretextual and also irrelevant to his violation of the court's orders." (ECF No. 38 at 13). The Eleventh Circuit affirmed the conviction. (*See id.*, ECF No. 75).

In her motion Defendant does not point to any specific instances of deficiency in counsel's representation as a result of their "financial conflicts." In the contempt hearing, counsel testified that he was paid approximately $146,000 for his services. (Case No. 3:10mc63/MCR, ECF No. 38 at 4). In addition, counsel's conviction for criminal contempt centered on his refusal to continue representing Defendant and her husband pursuant to the CJA appointment, not for any deficiency in his representation. The court found counsel's request to withdraw was motivated only by financial considerations. Defendant has not demonstrated a conflict of interest based on these facts. *See Caderno v. United States*, 256 F.3d 1213, 1219 (11th Cir. 2001) (finding no actual conflict of financial conflict where petitioner could not pay

his trial counsel the full retainer fee and counsel moved to withdraw from representation at the conclusion of the trial; "Because Caderno only speculates that his counsel had an actual financial conflict, he has failed to establish that his counsel's financial interest actually conflicted with his representation of Caderno thereby adversely affecting Caderno's defense.").

Defendant claims counsel "was also drunk and under the influence during much of the trial as noted in his contempt hearing." (ECF No. 1834 at 49). The court noted in counsel's contempt proceeding that counsel claimed he wanted to withdraw from the case because a third party had told him that Defendant and her husband were complaining about his inadequate representation at trial due in part to his consumption of alcohol. (*See* 3:10mc63/MCR, ECF No. 38 at 4 n.8). The court found that these complaints were hearsay and that "the Hirmers did not bring any complaints or accusations about Dickstein before the court until they complained at the hearing on the motion for reconsideration that he abandoned them following trial." (*Id*. at 13). The court did not credit this accusation when finding counsel guilty of criminal contempt. Defendant has not demonstrated a conflict or ineffective assistance of counsel based on this unsubstantiated claim.

In paragraph 48, Defendant claims that counsel had a conflict of interest based on his previous representation of Nadine Griffin, a salesperson with Global and a member of the Executive Counsel of PQI. Before Defendant's trial, Griffin had been criminally convicted of filing false tax returns. (*See* ECF No. 1440 at 283). In her motion, Defendant failed to identify any inconsistent interests between herself and Griffin or point to any specific instances in the record to suggest an actual conflict or impairment of her interests. In her reply, Defendant claims that once counsel learned that Griffin promoted PQI debt products which the Government was targeting, he "was not willing to risk another indictment for Griffin [or Struckman] to protect the Hirmers" by calling her as a witness. (ECF No. 1914 at 28). This assertion, without more, is mere speculation. Defendant has not demonstrated an actual conflict of interest in this claim.

While Defendant complains that counsel's "conflict" caused him not to call Griffin as a defense witness, the record reflects that Defendant testified about Global's evolution into PQI and discussed the Executive Council and products and vendors. (*See* ECF No. 1463 at 53-75). In addition, Defendant attempted to distance herself from Global, even testifying about things Global did that she believed were illegal. (*Id*. at 77-80). Griffin's testimony would have been cumulative to

Defendant's own trial testimony. Part of trial counsel's strategy centered on distancing Defendant and PQI from Global and those associated with Global who had been criminally convicted, so calling Griffin may have undermined that strategy as well. Defendant even acknowledges that counsel decided at the last minute that he did not want a convicted felon on the stand. (ECF No. 1914 at 27). Defendant fails to demonstrate that trial counsel's failure to call Griffin as a witness was based on anything other than reasonable trial strategy. Defendant has not demonstrated an actual conflict of interest in this claim.

C.    Ineffective Assistance of Sentencing Counsel

The record reflects that the court continued Defendant's original sentencing proceeding, scheduled for July 6, 2010, until October 27, 2010, to allow time for new counsel, Richard Greenberg, to familiarize himself with the case. (*See* ECF Nos. 1391, 1407, 1489). At the sentencing hearing, sentencing counsel acknowledged he had time to prepare, having met with Defendant several times and reviewed the record and Presentence Investigation Report ("PSR"). (ECF No. 1617 at 17-18).

In paragraph 51, Defendant alleges ineffective assistance of sentencing counsel when he incorrectly challenged errors in the PSR and failed to identify proper case law, which she claims resulted in an enhanced sentence. (ECF No. 1834 at 53). In

her motion, Defendant does not support this claim by citing these errors with specificity. The record reflects sentencing counsel responded to the PSR, correcting alleged factual errors and addressing the sentencing calculations. (*See* ECF No. 1323, Response to the Presentence Investigation Report ("Response to PSR")).

In paragraph 52, Defendant alleges sentencing counsel "could have but did not object to all customers being victims and argued that some legitimate services were rendered." (ECF No. 1834 at 53). Despite these assertions, the record is clear that sentencing counsel addressed the loss and victims calculation in the Response to PSR, arguing the Government "greatly exaggerated the 'loss'" in the case and the loss did not approach $20,000,000. The Response to PSR states that "[a] substantial amount of the funds derived during the offense conduct were used for such things as meals at seminars and health-related presentations," so are not properly classified as "pecuniary harm." (*Id*. at 3, § 7). The Response continues, "[i]t is impossible to say that all '11,000 individuals who were in the customer database maintained by the principals of PQI' were victims. Only a minute percentage of people who paid funds to PQI, or any associated entity, complained." (*Id*.).

In paragraph 53, Defendant alleges sentencing counsel failed to raise an *Ex Post Facto* Clause argument that the Sentencing Guidelines in effect at the time of the

offense, 2002, should have been used in sentencing her.  (ECF No. 1834 at 54).

While Defendant's criminal activities began around 2002, the activity continued until

the time of the indictment in 2008.  The court properly sentenced Defendant using the

Guidelines in effect at the time of sentencing.  *See United States v. Bailey*, 123 F.3d

1381, 1406-07 (11th Cir. 1997) (holding that where a defendant has been convicted

of multiple counts, the *Ex Post Facto* Clause is not violated when sentencing all

related counts under the Guidelines Manual in effect at the completion date of the

latest count).  Sentencing counsel is not ineffective for failing to raise a meritless

argument.

Defendant also argues the Government stipulated that co-conspirators cannot

be considered "victims," so this enhancement should not apply.  Defendant raised this

issue in her direct appeal.  The Eleventh Circuit held "[w]e cannot conclude there was

clear error in the district court's loss calculation . . .  Similarly, we cannot conclude

that the district court erred in finding at least 250 victims.  At the very least, the

purchasers of Merino's debt elimination product were all victims and the Government

proved that there were at least 360 of them.  Thus, there is no error." *Merino*, 545 F.

App'x at 870.  Defendant has failed to demonstrate that her sentencing counsel

rendered ineffective assistance at sentencing.

Case Nos.: 3:08cr79/MCR/CJK; 3:15cv282/MCR/CJK

D.    Ineffective Assistance of Appellate Counsel

Defendant's sentencing counsel took a direct appeal on her behalf.  The Initial Brief, some eighty pages in length, raised eight issues.  (*See* ECF No. 1885, Exhibit 1).  The proper standard for evaluating a claim of ineffective assistance of appellate counsel is that enunciated in *Strickland*.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).  The Supreme Court has held that counsel need not raise every nonfrivolous claim on appeal.  *See Jones v. Barnes*, 463 U.S. 745 (1983).  The Court in *Jones* emphasized the importance of winnowing out weaker arguments in favor of stronger ones.  The Court stated:

> 'Most cases present only one, two, or three significant questions . . . . Usually, . . . if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention.  The effect of adding weaker arguments will be to dilute the force of the stronger ones.'  (Citing R. Stern, Appellate Practice in the United States 266 (1981)).

*Id.*, 463 U.S. at 752.  The Court has also stated that while one may bring a *Strickland* claim based on appellate counsel's failure to raise a particular claim in a merits brief, it will be difficult to demonstrate incompetence.  *See Robbins*, 528 U.S. at 288.  "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Id.*  (citation

omitted).  To demonstrate prejudice, a defendant must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, she would have prevailed on appeal.  *See id.*, 528 U.S. at 285.  If an omitted claim would have had a reasonable probability of success on appeal, then counsel's performance necessarily resulted in prejudice. *Heath v. Jones*, 941 F.2d 1126, 1132 (11th Cir.1991).

In paragraph 56, Defendant alleges her appellate counsel failed to raise a claim that the jury instructions violated *United States v. Santos*, *supra* (holding  in the context of an illegal gambling operation that the term "proceeds" in the money laundering statute means "profits").  (ECF No. 1834 at 55).  The record reflects trial counsel requested that the court instruct the jury that for purposes of money laundering, the term "[p]roceeds means profit, not gross receipts," but the court denied the request and left the term undefined.  (ECF No. 945 at 26, Hirmer's Proposed Jury Instructions (2nd Set)).  Appellate counsel specifically raised this issue in Defendant's direct appeal.  (*See* ECF No. 1885, Exhibit 1, Hirmer Brief at 45-49). As discussed *supra*, the Eleventh Circuit held the argument was foreclosed by precedent.  *Merino*, 545 F. App'x at 869.

In her reply, Defendant argues appellate counsel failed to make the "merger problem" the focal point of the *Santos* claim. (ECF No. 1914 at 24-25). Defendant believes the dismissal of the wire fraud counts in the indictment merged her money laundering charges with the underlying fraud charges. Defendant states that she informed appellate counsel that she wished this argument to be raised on appeal, though she acknowledges that this argument would have been one of first impression. Defendant has not demonstrated ineffective assistance in appellate counsel's failure to make a merger argument. *See United States v. Esquenazi*, 752 F.3d 912, 935 (11th Cir. 2014) (finding no merger between concealment money laundering charges and the underlying offenses that generated the proceeds to be laundered, and stating that "because no majority of the Court agreed upon a rationale in *Santos*, we have recognized that the narrowest concurring opinion . . . .").

Defendant also alleges appellate counsel should have disputed that the jury instructions met the standard set forth in *Cuellar*, *supra* (holding that the Government must prove that the purpose of the financial transactions was to conceal the nature, location, source or ownership of funds). The record demonstrates that the court instructed the jury as follows:

> As to Count 2, money laundering designed in whole or in part to conceal or disguise the nature, location, source, ownership, or the control of the

> proceeds as specified in unlawful activity means that the defendant
> knowingly conducted or attempted to conduct a financial transaction
> knowing that the funds or property involved in the financial transaction
> represented the proceeds of some form of unlawful activity, that the
> funds or property involved in the financial transactions did, in fact,
> represent the proceeds of the specified unlawful activity, here, wire
> fraud, and that the defendant engaged in the financial transaction
> knowing that the transaction was designed in whole or in part to conceal
> or disguise the nature, location, source, ownership, or control of the
> funds or property.

(ECF No. 1450 at 54-55). The court gave the following additional instruction at trial

counsel's request:

> If you find there were illegal proceeds from wire fraud, I instruct you
> that where the defendant simply spends the illegal proceeds and did not
> intend to conceal or disguise the nature, location, source, ownership, or
> control of the funds, then the defendant did not engage in money
> laundering or a conspiracy to commit money laundering.

(*Id*. at 56-58, 24). While appellate counsel did not directly raise a *Cuellar* claim, a

reasonable appellate attorney could have determined that a claim based on *Cuellar*

would be foreclosed by the jury instructions given at trial. Appellate counsel is not

required to raise every nonfrivolous claim on appeal. *See Jones*, *supra.*

Defendant has also failed to demonstrate prejudice. The jury heard ample

evidence at trial that Hicks designed MYICIS to conceal or disguise the individual

ownership of the funds in the pooled account. The Eleventh Circuit stated in

Defendant's appeal, "[w]e reject summarily the sufficiency challenges by the Hirmers

. . . to their money laundering conspiracy convictions.  There was ample evidence to support each conviction."  *Merino*, 545 F. App'x at 869.  Because Defendant has not shown a reasonable probability of success on appeal, she has not demonstrated ineffective assistance of appellate counsel in this claim.

In paragraph 57, Defendant alleges appellate counsel did not raise issues "concerning constructive conversion of the indictment, whereas the prosecutor proved only that money was transferred and not concealed."  (ECF No. 1834 at 56). Defendant's claim is belied by the record.  Appellate counsel argued as follows in Defendant's Initial Brief:

> Assuming *arguendo* Mrs. Hirmer possessed the requisite *mens rea* for concealment money laundering, her conviction should still be overturned since the government failed to prove her activities were designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds with which she dealt.  The record is replete with evidence showing Mrs. Hirmer **openly** received proceeds from PQI activities and openly conducted financial transaction with those proceeds.

(ECF No. 1885, Exhibit 1, Hirmer Brief at 52) (emphasis in original).  As noted above, the Eleventh Circuit found that ample evidence supported Defendant's money laundering conspiracy conviction, so Defendant cannot demonstrate prejudice.  *See Merino*, 545 F. App'x at 869.

If Defendant's argument contends appellate counsel should have raised the issue that the indictment had been constructively amended, the merits of this claim were addressed in her similar ineffective assistance of trial counsel claim. *See* A ii**,** *supra*. As explained more fully there, the indictment was not constructively amended. Defendant has failed to show this is a meritorious claim and or one that would have prevailed on appeal.

In paragraph 58, Defendant claims appellate counsel rendered ineffective assistance of counsel "when he failed to raise a preserved argument concerning the confrontation clause and the dispute which was created for the purpose of trial and objected to as hearsay." (ECF No. 1834 at 56). This claim is denied because Defendant has not cited the record or provided any support for this less than self-explanatory claim.

In paragraphs 59 through 61, Defendant claims appellate counsel fell short by not urging that the indictment should have been dismissed on First Amendment grounds. The record reflects that trial counsel raised this issue in a pretrial motion *in limine*. (*See* ECF No. 333). The court denied the motion, holding as follows:

> The constitutional guarantee of free expression does not extend to speech used as an integral part of conduct in violation of a valid criminal statute. *New York v. Ferber*, 458 U.S. 747, 761-62 (1982). Moreover, the First Amendment does not prohibit the government's use of speech

> to prove motive or intent. *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). The First Amendment prohibits official actions, including criminal prosecutions, in retaliation for speaking out. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). However, adverse official actions may be taken against a speaker on non-retaliatory grounds. *Id*. The Hirmers offer little more than their own self-serving assertions to show the government has a retaliatory motive.

(ECF No. 491 at 5-6) (footnote omitted). Additionally, Mark Hirmer's sentencing counsel, Robert Augustus Harper, Jr., made this argument at sentencing, and the court rejected it as follows:

> [Mr. Harper,] that argument was presented to the Court numerous times throughout the trial. It was rejected by the Court during trial. This is not an issue of freedom of speech. It might have been the case of freedom of speech if this had not been speech that was packaged and marketed and sold to the public, but that's not what we had at trial. This is not a case of freedom of speech. The jury reached its verdict so we need to move on from there.

(*See* ECF No. 1617 at 24). Given the case law governing this claim, appellate counsel's decision not to raise the issue on appeal is not unreasonable. *See Jones*, *supra*.

In paragraph 62, Defendant complains that appellate counsel failed to correct misstatements in the trial transcript. Specifically, she claims the transcripts reference a tape series which was a Global product, not a PQI product, and that this mistake "was used by the government to convince the appellate court that PQI had the same

'bogus trusts' that 'Global' had, which prejudiced the case." (ECF No. 1834 at 62).

Even had appellate counsel been aware of this alleged error, his decision not to raise

it is not unreasonable given the overwhelming evidence in the record that Defendant

knew PQI's activities were illegal. The Eleventh Circuit stated, "there is strong

evidence here that each of these defendants knowingly joined a conspiracy to promote

and market tax evasion schemes to third parties. . . . there is strong evidence here of

a tax evasion conspiracy-*i.e.*, to market to taxpayers products that would help those

taxpayers to evade their taxes." *Merino*, 545 F. App'x at 869, n.3. Defendant has

failed to demonstrate ineffective assistance of appellate counsel in this claim.

Finally, Defendant argues appellate counsel rendered ineffective assistance in

failing to raise the *Ex Post Facto* Clause sentencing issue on appeal. As discussed

*supra*, the court properly sentenced Defendant under the Sentencing Guidelines in

effect at the time of her sentencing hearing. She cannot demonstrate ineffective

assistance of appellate counsel in this claim. *See Bolender v. Singletary*, 16 F.3d

1547, 1573 (11th Cir. 1994) ("It is axiomatic that the failure to raise non-meritorious

issues does not constitute ineffective assistance.").

# CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing § 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), § 2255 Rules.

After review of the record, the court finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Case Nos.: 3:08cr79/MCR/CJK; 3:15cv282/MCR/CJK

Accordingly, it is respectfully **RECOMMENDED**:

1.      Defendant Claudia Hirmer's Motion under 28 U.S.C. § 2255 to vacate,

set aside, or correct sentence (ECF No. 1834) be **DENIED**.

2.      A certificate of appealability be **DENIED**.

At Pensacola, Florida, this 13th day of June, 2018.


/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**




<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**


Case Nos.: 3:08cr79/MCR/CJK; 3:15cv282/MCR/CJK